[Civ. No. 29616. Second Dist., Div. Two. June 29, 1966.]

SPINDLER REALTY CORPORATION, Plaintiff and Appellant, v. JOHN C. MONNING, Defendant and Respondent.

SPINDLER REALTY CORPORATION, Plaintiff and Appellant, v. CITY OF LOS ANGELES, Defendant and Respondent.

(Consolidated Cases.)

256

Barry Brannen for Appellant.

Roger Arnebergh, City Attorney, Bourke Jones, Assistant City Attorney, Robert C. Summers and William B. Burge, Deputy City Attorneys for Respondents.

McCOY, J. pro tem.*—These are appeals from a judgment of the superior court denying a petition for a writ of man-

*Assigned by the Chairman of the Judicial Council.

date and from a judgment declaring the rights of the parties and denying an injunction.

In its first action appellant Spindler Realty Corporation (hereafter referred to as Spindler) sought a writ of mandate or writ of certiorari commanding John Monning, as general manager and superintendent of building of the department of building and safety of the City of Los Angeles, to issue a building permit for which it had applied and to rescind his action denying the permit. In its second action, Spindler sought an injunction against the enforcement of a certain zoning ordinance and a judgment that the ordinance is null and void insofar as it affects Spindler's property. For convenience, Monning and the City of Los Angeles are here referred to collectively as the City. The actions were consolidated for trial and separate judgments were entered in each action denying the relief sought by Spindler. Pursuant to stipulation, the appeals are consolidated for hearing and decision here.

## *The Facts*

There is no dispute as to the following facts as found by the court in both actions. In 1948 Spindler was the owner of the subject property consisting of approximately 21 acres in the Santa Monica Mountains, located on Mulholland Drive near its junction with Coldwater Canyon Drive. Spindler also owned substantial adjacent property. In September of that year, on Spindler's application, the subject property was rezoned from R-1 to R-5, thus permitting the construction of a hotel or apartment house or other multiple dwelling. At that time the City refused to rezone Spindler's adjacent property from R-1 to C-1 so that it could be used for commercial purposes.

In April 1956, in proceedings instituted by Spindler, the municipal code was amended to authorize the carrying on of incidental business and recreational facilities in any hotel or apartment house situated on property zoned R-5, subject to certain conditions not material here. Shortly thereafter, Spindler obtained a conditional use permit for such use of its property through November 1956. This conditional use was later extended and remained in effect until December 4, 1961. In August 1956 Mulholland Drive was designated as a major highway.

In June 1960, in connection with the development of a comprehensive master plan of land use for that part of the Santa Monica Mountains including the subject property, all the property adjacent to and surrounding the subject property

was rezoned from R-1 to R-1-H. The general effect of this rezoning was to increase the lot size for single family dwellings to 15,000 square feet. The subject property remained zoned R-5.

In August 1961 the Board of Building and Safety Commissioners modified its grading regulations to permit Spindler to develop a building site in an area other than a subdivision. On September 27, 1961, a grading permit was issued to Spindler for the preparation of a building site on the subject property without reference to any particular proposed use of the property as to the number, size or type of buildings to be erected on the site. Later Spindler filed the required bond of $275,000 conditioned on its faithful compliance with the terms and conditions of the grading permit. The City also granted Spindler's application for a class "B" permit, permitting Spindler to grade in the City's right of way. It also filed plans for temporary erosion control methods which were approved by the Department of Public Works. On November 17, 1961, the City also authorized Spindler to extend the toes of fill-slopes on certain adjacent property owned by C. W. Foster, Inc.

On October 9, 1961, J. A. Thompson & Son started work on the subject property under the grading permit, consisting of brush clearance and access road leveling. The property had been staked by surveyors a few days earlier. On October 18, 1961, "in reliance on said R-5 zoning and said Grading Permit and other administrative acts" of the City, Spindler, in good faith, entered into a contract with J. A. Thompson & Son for the grading of the subject property in accordance with the building permit. By this contract Spindler agreed to pay J. A. Thompson & Son not less than $562,796, based on the actual amount of the work done. Work under this contract was discontinued on March 8, 1962, except for putting the development and maintaining it in a safe condition.

On October 26, 1961, the city planning commission, finding that "no development activity has occurred on the property," initiated proceedings to consider the rezoning of the subject property from R-5 to R-1-H. When this resolution was adopted the planning commission was mistakenly informed that no physical development work had been done on the property and that Spindler had not talked with its architect for over two and one-half years. On October 31 Spindler asked for a reconsideration of the resolution which had been adopted without notice. Following a public hearing before a hearing examiner.

of the planning commission on December 18, the commission adopted the examiner's findings and recommended the change of zone. On March 8, 1962, the city council adopted ordinance No. 121338, the subject of this action, rezoning the subject property from R-5 to R-1-H. This ordinance became effective April 15, 1962.

With the several dates referred to in the foregoing paragraph in mind we turn to certain other findings. The court found that on October 27, 1961, the grading operations "had reached a point where it would have been highly dangerous in the event of rainfall to have done nothing for the protection of property owners below the grading operations" and that, under this and other circumstances spelled out in the finding, Spindler's decision immediately after October 27, the day on which he had been informed of the planning commission's resolution of October 26 "to proceed with the grading was an entirely reasonable one to make. . . ." As of October 26 "a substantial portion of the grading under the grading permit had been performed" on the subject property; that "at the very least [Spindler] had acquired a vested right to complete the grading under the grading permit issued to it, and that if it should be the law that a vested right under said grading permit gives petitioner a vested right not only to complete the grading but also to build as permitted by R-5 zoning, a vested right to so build, subject to all other laws and ordinances applicable, had arisen."

After the property was rezoned R-5 in 1948, Spindler sought to develop the property for a hotel. When it became apparent in 1960 that financing a hotel was not feasible, Spindler had plans prepared for an apartment house complex, proceeding therein in good faith "at least until October 27, 1961," in reliance on the R-5 zoning. Before the commencement of grading in October 1961, "the best and economically the most feasible use for the subject property was for R-5 multiple family dwellings" although on October 27 extensive grading would have to be done to develop it for any purpose.

On February 23, 1962, Spindler filed plans for a high-rise apartment complex and an application for a building permit, but because these plans were inadequate for checking it asked the Department of Building and Safety not to check them and to wait for new plans. New plans were filed on March 27. On April 13 Spindler applied for a "foundation only" building permit, but this was denied because the site was not suitable for immediate construction, even if it had remained zoned R-5.

The department approved, on April 16, the heating and refrigeration plans as submitted by Spindler. On April 27 the Department of Building & Safety submitted to Spindler a detailed list of corrections to the building plans filed March 27 and advised Spindler that the proposed construction was prohibited by the zoning regulations [presumably by the ordinance adopted March 8]. Spindler asked the department to proceed with the plan checking. On May 1 the fire department also submitted a detailed list of corrections. The parties stipulated that all required corrections either had been or could be made after June 1, 1962.

The court found that from 1948 through the year 1964 Spindler spent $522,541.55 in the development of the subject property. Of this, $305,287.12 was spent during the period of November 1, 1961 through April 30, 1962. The obligations accruing before January 1, 1961, were incurred in connection with both the hotel development and the apartment development. All those after January 1, 1961, were incurred in connection with the apartment house development.

Ever since June 1, 1962, the Department of Building and Safety has refused to issue a building permit, although at all times Spindler has "sincerely desired" such a permit. The parties stipulated that Spindler exhausted all administrative remedies available to it before turning to the court for relief.

Certain other findings will be commented on when we consider Spindler's contentions on these appeals.

### The Issues

Appellant's primary contentions common to both actions are: (1) that on the facts found by the trial court it had a vested property right in the development of its property, of which it could not be constitutionally deprived; (2) that it had acquired a nonconforming use which was protected under the provisions of section 12.23C of the Los Angeles Municipal Code; and (3) that the ordinance adopted March 8, 1962, was oppressive and discriminatory and bore no relation to the public welfare or safety and is unconstitutional on that ground.

### Appellant's Claim That it Has a Vested Right

We assume at this point that the ordinance adopted March 8, 1962, is valid, " 'and insofar as it can be complied with and applied without a denial of constitutional rights it will be held

to be proper and lawful legislation.' " (*Bernstein* v. *Smutz,* 83 Cal.App.2d 108, 120 [188 P.2d 48].) ■ But, as the court there said, " 'a statute, innocuous and valid on its face, may become invalid in its application, in which event it is proper for the petitioner to show the facts by which he contends that as to him the law is unreasonable, oppressive and void.' "

Section 91.0201 of the Los Angeles Municipal Code provides that no person shall commence or perform any grading without a permit. Under the grading regulations of the City, grading may be conducted only for the purpose of building. The same section of the municipal code also provides that a building permit must be obtained before commencing the construction of any building.

■ The general rule applicable to all cases such as this is that if a property owner has acquired a vested right under a permit, the permit cannot be revoked, particularly where, on the faith of the permit, the owner has incurred material expense. " 'Such a permit has been declared to be more than a mere license revocable at the will of the licensor. When, in reliance thereon, work upon the building is actually commenced and liabilities are incurred for work and material, the owner acquires a vested property right to the protection of which he is entitled.' " (*Trans-Oceanic Oil Corp.* v. *City of Santa Barbara,* 85 Cal.App.2d 776, 784 [194 P.2d 148]. To the same effect see *Kissinger* v. *City of Los Angeles,* 161 Cal. App.2d 454 [327 P.2d 10].) " [A] permittee who has expended substantial sums under a permit cannot be deprived by a subsequent zoning ordinance of the right to complete construction and to use the premises as authorized by the permit." (*County of San Diego* v. *McClurken,* 37 Cal.2d 683 [234 P.2d 972].) These rules are reiterated in the recent case of *Anderson* v. *City Council,* 229 Cal.App.2d 79, where the court said (pp. 89-90 [40 Cal.Rptr. 41]) : "Where a building permit to erect a specific type of building is issued by a county or city and the permittee acts upon it and incurs obligations, or in good faith commences construction, his rights become vested and the governmental body is thereafter estopped to set up a zoning ordinance subsequently enacted. (*Price* v. *Schwafel, supra,* [92 Cal.App.2d 77 (206 P.2d 683)].) Where no such permit has been issued, it is difficult to conceive of any basis for such estoppel. . . . These authorities [*Brougher* v. *Board of Public Works,* 205 Cal. 426 (271 P. 487) ; *Jones* v. *City of Los Angeles,* 211 Cal. 304 (295 P. 14) ; *Trans-Oceanic Oil*

*Corp.* v. *City of Santa Barbara,* 85 Cal.App.2d 776 (194 P.2d 148) ; *Griffin* v. *County of Marin,* 157 Cal.App.2d 507 (321 P.2d 148)] establish the rule that respondents did not acquire a vested right, as against future zoning, merely by purchasing the property in reliance on the existing zoning and thereafter making certain endeavors to develop it for a specified use. Since all of these acts were performed prior to the date upon which respondents sought to obtain a building permit, they could not have been performed in reliance on the required official action, or the granting of a license or privilege, by the City. It follows that respondents never acquired any privilege which could ripen into a vested right and that the court erred in holding that the city was estopped from rezoning respondents' property.''

Spindler concedes that it has no building permit. Its contention is that its claim to a vested right to proceed with the building of multiple dwellings does not depend upon the issuance of a building permit but upon a showing that after the R-5 zone was established it relied in good faith on the permissive actions and authorizations of the City, including the issuance of the grading permit, all taken pursuant to existing zoning, and that it incurred ''substantial construction costs and like obligations'' in reliance on such permissive actions and authorizations. Spindler seems to contend that, in view of the findings of the trial court in its favor on these matters, the City was estopped to adopt the ordinance rezoning its property and was estopped to refuse to issue a building permit by reason of that ordinance. Of course, Spindler did not incur any ''construction costs,'' and the trial court did not so find. Further the court found only that ''in reliance on said R-5 zoning petitioner, at least until October 27, 1961, at all times proceeded in good faith to complete said engineering and architectural plans.''

The trial court found that as of October 26, 1961, Spindler had at the very least acquired a vested right to complete the grading under its grading permit. ■ In the final analysis the question before us, as the trial court recognized, is whether that vested right gives Spindler a vested right, without the issuance of a building permit, not only to complete the grading but also to build as permitted by R-5 zoning, so as to render the later rezoning inoperative. We think this question must be answered in the negative.

Although we find no decisions squarely in point, the case here is closely analogous to *Anderson* v. *City Council,* 229

Cal.App.2d 79 [40 Cal.Rptr. 41]. In that case plaintiffs had purchased the property after being assured by the city officials that construction of a service station was "still a permissible use." Thereafter, they invested some $3,000 in time and money in attempting to secure a leasing agreement with an oil company and in otherwise preparing to develop the property for a filling station. Several months after the purchase of the property the owners applied for a building permit. Four days later the city council adopted an emergency ordinance requiring a land use permit for each new use of property within the district. A few months later the city council voted to deny the owners' application for a land use permit. There, as here, there was evidence that the property was worth substantially more for the intended use than it would be worth if such use were prohibited. After an extensive review of the cases the court held (p. 90) that these authorities "establish the rule that respondents did not acquire a vested right, as against future zoning, merely by purchasing the property in reliance on the existing zoning and thereafter making certain endeavors to develop it for a specific use. Since all of these acts were performed prior to the date upon which respondents sought to obtain a building permit, they could not have been performed in reliance on the required official action, or the granting of a license or privilege, by the city. It follows that respondents never acquired any privilege which could ripen into a vested right. . . ."

The fact of the matter is that at all times after October 27, 1961, Spindler was taking a calculated risk. That was the day that Spindler learned of the resolution adopted the day before, initiating proceedings for the rezoning of the subject property from R-5 to R-1-H. It is true that from 1959 and at least until October 27, 1961, Spindler was proceeding in good faith to complete its engineering and architectural plans for an apartment house complex on the property in reliance on the R-5 zoning, as the court found, and doubtless in reliance on the totality of the permissive actions and authorizations of the City during that period. The court also found that on October 26, Spindler "had every reasonable hope and expectation that the proposed rezoning of the subject property from R-5 to R-1-H would not eventually become the law. In addition, the legal status of the date of October 26, 1961, as a date after which petitioner might eventually be found to have expended money at petitioner's risk was, and still is, uncertain. It was further uncertain at the time whether it would eventually be found, as a

matter of law, that petitioner could acquire vested rights to build under a grading permit as distinguished from a building permit, and what the crucial date of the acquisition of such vested rights might be'' and that under these circumstances and others relating to the conditions of the property, Spindler's decision ''immediately after October 27, 1961, to proceed with the grading was an entirely reasonable one to make, and that there was nothing whatsoever morally reprehensible in proceeding.''

In *City of Tucson* v. *Arizona Mortuary,* 34 Ariz. 495 [272 P. 923], the property owner had purchased land, obtained a building permit and let a contract for the building of a mortuary, but before any material amount of construction had been done it was fully advised that, on the application of a majority of the property owners in the area, the common council of the city was considering an ordinance which would have prevented the use of the property for that purpose. ''Instead of awaiting the action of the council, it apparently proceeded on the theory either that the ordinance would not be passed, or that, if passed, it was void. Having taken that chance, it may not now be heard to set up any loss to it which arose *after* it had knowledge that the ordinance was being considered. But even if plaintiff suffered some damage through things occurring *before* the protest, financial loss, no matter how severe, does not of itself give parties a vested right to continue a business, no matter how long it has been conducted, if the business is one whose location may be regulated under the police power.'' In holding that the plaintiff was not entitled to an injunction against the enforcement of the ordinance, the court quoted with emphasis from *Hadacheck* v. *Sebastian,* 239 U.S. 394 [36 S.Ct. 143, 60 L.Ed. 348], where it was held, on review of a judgment of the Supreme Court of this state involving the validity and enforcement of a zoning ordinance (165 Cal. 416 [132 P. 584, L.R.A. 1916B 1248]), that the imperative necessity for the existence of the police power ''precludes any limitations upon it when not exercised arbitrarily. *A vested interest cannot be asserted against it because of conditions once obtaining.*'' Furthermore, said the court in *City of Tucson,* ''any loss for money expended *after* plaintiff had notice of the proposed ordinance was at its peril, and cannot be considered as a vested right, entitled to any consideration.'' *Rosensweig* v. *Crinnion,* 139 N.Y.S.2d 172, and *Kiges* v. *City of St. Paul,* 240 Minn. 522 [62 N.W.2d 363], are to the same effect.

There is nothing in the cases on which appellants rely which leads us to a different conclusion. Such cases as *Trans-Oceanic Oil Corp.* v. *City of Santa Barbara,* 85 Cal.App.2d 776 [194 P.2d 148], and *Kissinger* v. *City of Los Angeles,* 161 Cal. App.2d 454 [327 P.2d 10], simply affirm the proposition that a land owner has a vested right to use his property in accordance with the terms of his permit, and that a valid permit once issued cannot be arbitrarily revoked.

The decisions from other jurisdictions cited by Spindler are not persuasive. In *Herskovits* v. *Irwin,* 299 Pa. 155 [149 A. 195], for example, the court held that where, upon application for a building permit to construct a six-story building which complied with the zoning laws then in effect, the owners were issued a permit for "excavation and form work in accordance with foundation plan submitted," and thereafter incurred substantial expense and obligations and commenced work on the excavation, they acquired a vested right to a permit to complete the building of which they could not be deprived by a subsequently enacted amendment to the zoning ordinance limiting the permissible height of buildings. It may well be, as the court there said, that it would not satisfy "a proper sense of justice" to say, in the circumstances of that case, a vested right was created in the foundations of the six-story building but not in the building itself. There the limited permit had been issued on an application for a building permit accompanied by drawings which showed the general scheme of the building, and the court held that in reality the owners were simply taking "a second step in their effort to obtain a formally complete permission to erect their building." That is not the case here.

Such cases as *People* ex rel. *Skokie Town House Bldrs., Inc.* v. *Village of Morton Grove,* 16 Ill.2d 183 [157 N.E.2d 33], and *Fifteen-Fifty North State Bldg. Corp.* v. *City of Chicago,* 15 Ill.2d 408 [155 N.E.2d 97], are distinguishable here, in that in each of those cases a building permit had been issued and was later revoked. It is true that in the *City of Chicago* case, the court approved the decision in *Deer Park Civic Assn.* v. *City of Chicago,* 347 Ill.App. 346 [106 N.E.2d 823], that any substantial change of position, expenditures or incurrence of obligations occurring under a building permit or in reliance upon the probability of its issuance is sufficient to create a right in the permittee and entitles him to complete the construction and use of the premises for the purposes originally authorized irrespective of a subsequent zoning or change in zoning classi-

fication. Here, of course, Spindler knew when it obtained its grading permit that under the municipal code it would be required to obtain a building permit in order to construct any buildings on its property. On October 27, 1961, it knew that proceedings had been initiated to rezone its property. While it then had ''every reasonable hope and expectation that the proposed rezoning of the subject property from R-5 to R-1-H would not eventually become the law,'' as the trial court found, it cannot be said that it thereafter incurred any obligations or expended substantial sums of money in reliance upon the probability that a building permit for R-5 construction would be issued.

In short, we are not convinced that a grading permit is analogous to a building permit, as contended by Spindler, even though under the regulations of the Department of Building and Safety, a grading permit on hillside property may only be granted for building purposes and a building permit would not have enabled it to build without a previously issued grading permit.

Spindler further claims that the trial court's Finding 43, that it had no vested right to erect any particular building or type of building or to put its property to any particular use except as permitted by the ordinance, is erroneous because its right to a building permit for multiple dwellings under the R-5 zoning was determined on March 27, 1962, the day on which it filed its application for a building permit. This contention is based on the fact that the ordinance did not take effect until April 15, and that the parties stipulated that all required corrections in the building plans filed with its application ''either have been or can be made after June 1, 1962.''

This contention has no merit. It was expressly held in *Brougher* v. *Board of Public Works*, 205 Cal. 426, 434-435 [271 P. 487], in which the sequence of events is substantially the same as that in the case here, ''that petitioners were not entitled to have granted to them the permit applied for by merely showing that they had complied with all the laws and ordinances effective in said municipality at the time of the filing of the application with said Board of Public Works when the further fact appeared that before final action had been taken on their application the ordinances under which said application had been made had been amended by the board of supervisors.'' As the court there said: ''In such cases there is no opportunity for any privilege to ripen into a vested right, for the reason that no privilege, in the sense used

in the authorities, is acquired until a permit has been issued." The earlier case of *Miller* v. *Board of Public Works,* 195 Cal. 477 [234 P. 381, 38 A.L.R. 1479], is to the same effect. *Munns* v. *Stenman,* 152 Cal.App.2d 543 [314 P.2d 67], *McCombs* v. *Larson,* 176 Cal.App.2d 105 [1 Cal.Rptr. 140], on which Spindler relies are readily distinguishable on the facts and are not in point.

We come back then, to *Anderson* v. *City Council,* 229 Cal. App.2d 79, where the court said (p. 89 [40 Cal.Rptr. 41]) that the property owners there "have been unable to cite a single California decision in which a property owner has been held to have acquired a vested right against future zoning without having first acquired a *building permit* to construct a specific type of building and having *thereafter* expended a considerable sum in reliance upon said permit. Such authority would appear nonexistent for the reason that the vested rights theory is predicated upon estoppel of the governing body. . . . Where no such permit has been issued, it is difficult to conceive of any basis for such estoppel." (Italics by the court.) ▇ Since no building permit was issued to Spindler, the City was not estopped to adopt the ordinance rezoning Spindler's property from R-5 to R-1-H.

### Appellant's Claim to a Protectable Non-conforming Use

Appellant also claims that the facts found by the trial court established that it has a nonconforming use protected by section 21.23C of the Los Angeles Municipal Code. The argument is that what is protected is the "intended" use or the purpose to which the land "may be put"; that the preparation of land for the employment of buildings is a "use" of the land for which it is entitled to protection; that where "buildings are employed" in connection with such "intended" use there is no amortization period for the liquidation of the use; and that if this were not so, ordinance 121338 would be unconstitutional.

This argument is not tenable, in that it is erroneously based on the definition of "use" in the municipal code and is contrary to the law. "Use" is there defined as: "The purpose for which land or a building is arranged, designed, or *intended* or for which either land or a building is or *may be* occupied or maintained." ▇ It is obvious, however, that the protection afforded to a "non-conforming use" by section 12.31C extends only to a "non-conforming use" which is

defined in section 12.03 as: "A use of a building or land which does not conform to the regulations of this Chapter and which lawfully existed at the time the regulations, with which it does not conform, became effective." As the court said in *Anderson* v. *City Council*, 229 Cal.App.2d 79, 88 [40 Cal.Rptr. 41]: "[I]t is the rule that 'The activity of the owner in the use of his property at the time it becomes subject to a zoning ordinance and not his plans regarding the future use of that property determines the scope of the nonconforming use excepted from the restrictions imposed by the ordinance.' (*Paramount Rock Co.* v. *County of San Diego* (1960) 180 Cal.App.2d 217, 232 [4 Cal.Rptr. 317]. . . . *Jones* v. *City of Los Angeles* (1930) 211 Cal. 304 [295 P. 14] ; *Willett & Crane, Inc.* v. *City of Palos Verdes etc. Estates* (1950) 96 Cal.App.2d 757, 761 [216 P.2d 85].)"

 In this case the learned trial court found as facts that: "42. Except for the grading on the subject property herein referred to and certain geological work, soil tests and survey- ing in connection therewith, there has been no actual existing use of the subject property for any purpose from September 27, 1961, to date, no building of any kind has ever been erected on the subject property and there has never been any use in connection with any building. 43. Petitioner and plaintiff has no vested or any other right to erect any particular building or type of building upon the subject property or to put it to any particular use, except as may now or hereafter be lawfully permitted . . . 44. Petitioner and plaintiff has not at any time mentioned herein established a nonconforming use of any kind upon the subject property." These findings, which are clearly supported by substantial evidence, appear to us to be findings of ultimate fact. Even if findings 43 and 44 are considered as misplaced conclusions of law, the court's conclusions of law are to the same effect, and as such they are supported by the facts found in finding 42. The fact that appellant's grading permit was not usable except to prepare the land for buildings does not compel a different finding or different conclusion.

### The Validity of the Ordinance

It is further claimed by appellant that ordinance 121338 is arbitrary, discriminatory and confiscatory in its application to the subject property and bears no reasonable relation to the public safety and welfare. Accordingly, it asserts that, considered as findings of fact, the conclusion of the trial court incorporated in findings 45, 46 and 47 is without support in the evidence.

The trial court found that the rezoning of the subject property from R-5 to R-1-H was consistent with the earlier, similar rezoning of all the surrounding and adjacent property, and was "consistent and compatible" with the existing zoning, land use and development of the adjacent and surrounding property; and that such rezoning is rationally connected with maintaining a limited density of development in the whole area in order to permit completion of a master plan and in order not to "further overburden . . . inadequate public facilities" in the area, including public streets and highways. The court also found that the ordinance "bears a substantial relationship to the accomplishment of a proper public purpose under the police power, and is not arbitrary or unreasonable. Its adoption is a matter over which reasonable minds might differ." Finally, the court found that the application of the ordinance to the subject property does not deprive the owner "of the entire use or entire economic benefit of its property and is not discriminatory or confiscatory. On the contrary, said ordinance is reasonable in object and not arbitrary in operation."

 The power of the courts of this state on review of the acts of a legislative body in the exercise of the police power is limited. "The determination of the need for a mode of exercising the power is primarily for the legislative body and the courts will not hold enactments invalid unless they are palpably unreasonable, arbitrary or capricious, having no tendency to promote the public welfare, safety, morals, or general welfare." (*Justesen's Food Stores, Inc.* v. *City of Tulare,* 43 Cal.App.2d 616, 621 [111 P.2d 424].) "A statute is not to be condemned as an improper exercise of the police power if any rational ground exists for its enactment. [Citations.] Every presumption is in favor of the validity of a statute, and its invalidity must be clear before it can be declared unconstitutional. [Citations.]" (*Corning Hospital Dist.* v. *Superior Court,* 57 Cal.2d 488, 496 [20 Cal.Rptr. 621, 370 P.2d 325].)

 ". . . [a] zoning ordinance, or its application to particular property, must have a 'reasonable tendency to promote the public morals, health, safety, or general welfare and prosperity of a community' (*Miller* v. *Board of Public Works,* [195 Cal. 477] at p. 488), and be free from arbitrary and discriminatory conception and application . . . ." (*Robinson* v. *City of Los Angeles,* 146 Cal.App.2d 810, 815 [304

P.2d 814].) ▮ "Questions of reasonableness and necessity depend on matters of fact. They are not abstract ideas or theories." (*Ayres* v. *City Council of Los Angeles,* 34 Cal.2d 31, 41 [207 P.2d 1, 11 A.L.R.2d 503].) ▮ But the necessity for the particular ordinance "is primarily a legislative and not a judicial function, and is to be tested in the courts not by what the judges individually or collectively may think of the wisdom or necessity of a particular regulation, but solely by the answer to the question is there any reasonable basis in fact to support the legislative determination of the regulation's wisdom and necessity?" (*Consolidated Rock Products Co.* v. *City of Los Angeles,* 57 Cal.2d 515, 522 [20 Cal.Rptr. 638, 370 P.2d 342].) As the court there said, quoting from *Miller* v. *Board of Public Works, supra,* " 'when the necessity or propriety of an enactment [is] a question upon which reasonable minds might differ, the propriety and necessity of such enactment [is] a matter of legislative determination.' So in *Ambler, supra* [*Euclid* v. *Ambler Realty Co.,* 272 U.S. 365 [47 S.Ct. 114, 71 L.Ed. 303, 54 A.L.R. 1016)], the United States Supreme Court said (272 U.S., at p. 388) : 'If the validity of the legislative classification for zoning purposes be fairly debatable, the legislative judgment must be allowed to control.' " ▮ "It is also the rule that the motives of the legislative body may not be weighed in measuring the legality of their action. (*McCarthy* v. *City of Manhattan Beach* (1953) 41 Cal.2d 879, 894 [264 P.2d 932] ; *Ferris* v. *City of Alhambra* (1961) 189 Cal.App.2d 517, 525 [11 Cal. Rptr. 475].)" (*Anderson* v. *City Council,* 229 Cal.App.2d 79, 91 [40 Cal.Rptr. 41].) Nor does the fact that the property owner may suffer some financial detriment "require invalidation of the zoning restriction, for 'every exercise of the police power is apt to affect adversely the property interest of somebody.' (*Zahn* v. *Board of Public Works,* 195 Cal. 497, 512 [234 P. 388].)" (*McCarthy* v. *City of Manhattan Beach,* 41 Cal.2d 879, 890 [264 P.2d 932] ; *Consolidated Rock Products Co.* v. *City of Los Angeles,* 57 Cal.2d 515, 530 [20 Cal.Rptr. 638, 370 P.2d 342].)

The rule as to the function of the courts in such cases is well summed up in *Lockard* v. *City of Los Angeles,* 33 Cal.2d 453, 461-462 [202 P.2d 38, 7 A.L.R.2d 990] : "The duty to uphold the legislative power is as much the duty of appellate courts as it is of trial courts, and under the doctrine of separation of powers neither the trial nor appellate courts are authorized to 'review' legislative determinations. The only function of the

courts is to determine whether the exercise of legislative power has exceeded constitutional limitations."

Appellant complains that the trial court "did not find on any of the basic facts relating to the issue," and refers particularly to paragraphs 42 to 47 of its proposed Findings of Fact and Conclusions of Law.　　　　 In our opinion, the trial court did not err in declining to adopt appellant's proposed findings and did not limit itself to conclusions of law.

This action was tried before the Honorable Otto M. Kaus, then a judge of the superior court, sitting without a jury. Shortly before the conclusion of the evidence, Judge Kaus had been appointed a Justice of the District Court of Appeal and had advised counsel that he desired to take his oath on December 31, 1964. On December 23, 1964, Judge Kaus announced his decision in favor of the City, saying in part: "On the disputed facts I have jotted down some things I feel I ought to find on but there will undoubtedly be others and I want you to feel free to request specific findings of fact, because, as I have indicated to you, I feel the matter ought to be honestly and fairly before the Appellate Court." After stating some of the matters on which findings should be made, Judge Kaus said: "Now, I don't know whether anything more specific ought to be found as to that. If so, I will gladly listen to suggestions." The minute order for that day reads in part: "The Court finds for the City. Findings ordered."

Counsel again appeared before Judge Kaus on December 31, 1964, "for the purpose of settling the findings, conclusions and judgment in this matter." At that time counsel stipulated on the record "to a waiver by both sides of any time requirements with respect to the service or signing by the Court for findings and conclusions of law," that is, "the ten-day time limitation of CCP, 634," but not any other rights the parties might have "in the action of the execution and the findings and the judgment." They then stipulated that Spindler "may lodge with the Court this day its proposed findings of fact and conclusions of law in action No. 798,477 and that he may be deemed to have objected to any departure from such proposed findings of fact and conclusions of law found in the actual findings of fact and conclusions of law made by the Court in action No. 798,477 and action No. 799,-416, and that the Court may make a Minute Order thereon and that the Minute Order together with the proposed findings of fact and conclusions of law become a part of the record."

They also stipulated that the City could file with the court its objections to Spindler's proposed findings as well as its own proposed findings, "with the understanding that what you are now to lodge with the court was before the court at the time when we discussed your proposed findings, Mr. Brannen's proposed findings and worked both of them over extensively." The minute order of that day reads, in part, "that the record of certain stipulations, with the minute order, be and hereby is, made a part of the record, together with the proposed Findings lodged with the Court by the plaintiff and petitioner and those to be lodged by defendant and respondent."

It is apparent from the record that the court did not direct either party to prepare findings as it might have done under Code of Civil Procedure, section 634. Instead, as permitted by that section, both parties served and lodged with the court their proposed findings, and by their stipulations waived the time limits of that section with respect to the signing of findings and reserved their rights as to any objections each might have to the findings thus proposed by the other. The proposed findings thus submitted by Spindler cannot be considered as "requests for special findings" under any reasonable interpretation of that section. "Parties have the right to request the trial judge to adopt certain findings of fact and conclusions of law. However, the trial judge is not bound to accept the proffered findings of fact and conclusions of law. He may do so *in toto,* in part, or disregard such proposed findings and conclusions in their entirety. The findings of fact and conclusions of law are those of the trial court and proposed findings are merely an aid and assistance to the court in preparing *its* findings of fact and conclusions of law." (*Howard* v. *Howard,* 119 Cal.App.2d 122, 124 [259 P.2d 41].)

Section 634, Code of Civil Procedure, was amended in 1959, providing for "requests for special findings" and "a written request for a specific finding" on some particular issue. (Stats. 1959, ch. 637, p. 2614.) "The purpose of the legislation was to compel trial judges to make findings on all material issues of fact." (*Calloway* v. *Downie,* 195 Cal.App.2d 348, 353 [15 Cal.Rptr. 747].) The section still provides, however, for the service of "proposed findings," "objections [and] counter-findings" in all cases where findings are to be made. *Bilger* v. *Bilger,* 54 Cal.App.2d 739, 743 [129 P.2d 752], on which Spindler relies, is not in point here, since that case was decided before the 1959 amendment to section 634.

Section 634, Code of Civil Procedure, provides that a request

for a specific finding may be made in conjunction with a motion under section 663 for another and different judgment. The findings of fact and conclusions of law and the judgments in these actions were signed and filed December 31, 1964. Spindler's notice of motion under section 663, filed January 16, 1965, states that the motion would be made on the grounds of "incorrect and erroneous conclusions of law not consistent with and not supported by Findings of Fact." We find nothing in this notice of motion which can be construed as a request for a special or specific finding in accordance with paragraphs 42 to 47 of Spindler's proposed findings of fact (cf. *Auer* v. *Frank*, 227 Cal.App.2d 396, 406-407 [38 Cal.Rptr. 684]), nor is there any written request for special or specific findings in the record.

The court made extensive findings as to all material facts necessary to support the judgments. In the absence of a written request for a specific finding "as provided in section 634, a judgment will not be set aside on appeal because of a failure to make an express finding upon an issue if a finding thereon, consistent with the judgment, results by necessary implication from the express findings which are made." (*Auer* v. *Frank, supra,* at 406; *Ellis* v. *Community Chevrolet, Inc.,* 242 Cal.App.2d 79 [51 Cal.Rptr. 154].)

The trial court expressly found that the ordinance is not arbitrary or unreasonable, and that "its adoption is a matter over which reasonable minds might differ." It also found that the application of the ordinance to the subject property does not deprive the owner "of the entire use or entire economic benefit of its property and is not discriminatory or confiscatory." These findings are supported by substantial evidence. The findings as a whole support the conclusion of the trial court that the ordinance is a valid exercise of the police power and is constitutional. We agree with that conclusion.

### The Court's Failure to Make Certain Findings

In the findings signed and filed December 31, 1965, the court found "that in view of the lack of easements for sewer and storm drain purposes through properties below petitioner's property, any development for R-1-H purposes would not have been very different from the point of view of grading than the development undertaken by petitioner." When the court denied Spindler's motions for another and different judgment (Code Civ. Proc., § 663), and for a new trial the

court struck from the findings the language just quoted pursuant to Code of Civil Procedure, section 662, stating that the findings of fact and conclusions of law and judgment previously entered "stand unaffected thereby." Spindler now contends that by striking this language from the findings and by failing to make any finding to the effect that the grading it had done on the property was not usable to develop the property for R-1 purposes, was prejudicial error.

The change in the findings effected by the court and its failure to adopt paragraphs 32 and 33 of Spindler's proposed findings of fact was not error. The record does not show that Spindler made any written request for specific findings in accord with those paragraphs of its proposed counterfindings, either before the entry of the judgment or in conjunction with its motion under section 663 of the Code of Civil Procedure. As we have noted above, the submission of proposed counterfindings does not serve this purpose. We are satisfied that the trial court made specific findings on all the issues and as to all facts necessary to support the judgment.

### Errors of Law

Spindler contends that in four instances the trial court erroneously struck out certain testimony and rejected its offer of proof: First, with reference to the testimony of the superintendent of grading for the City to establish knowledge on the part of the City that grading for R-5 development was not suitable for R-1 development; second, the testimony of the principal city planner relating to the issue of whether the grading for R-5 development constituted a protectable nonconforming use; third, the testimony of Spindler's zoning expert as to what constitutes a nonconforming use protectable under the municipal code; and *fourth,* the testimony of the same expert to the effect that the change in zone effected by the ordinance of March 8, 1962, was confiscatory, arbitrary and unreasonable.

In view of what we have said above on the principal issues in the case, there was no error in these rulings.

The judgments appealed from are affirmed. The purported appeals from the orders denying the motions of petitioner and plaintiff to vacate and set aside the judgment and to enter new and different judgments are dismissed.

Herndon, Acting P. J., and Fleming, J., concurred.

A petition for a rehearing was denied July 27, 1966, and

the opinion was modified to read as printed above. Appellant's petition for a hearing by the Supreme Court was denied August 24, 1966.