[L.A. Nos. 31615, 31616. Apr. 20, 1984.]

SANTA MONICA PINES, LTD., et al., Plaintiffs and Appellants, v.
RENT CONTROL BOARD OF THE CITY OF SANTA MONICA et al.,
Defendants and Respondents.

## COUNSEL

Royal M. Sorensen, Mark C. Allen, Jr., and Burke, Williams & Sorensen for Plaintiffs and Appellants.

Paul, Hastings, Janofsky & Walker, William B. Campbell, Peter K. Rosen, Boren, Elperin, Howard & Sloan, William Elperin, Tamila C. Jensen, Rhodes, Maloney, Hart, Mullen & Jakle, Christopher M. Harding, Mark Garrett, J. Charlton Wentz, Latham & Watkins, Stephen L. Jones, Alex M. Johnson, William A. Kerr, Peter A. Umoff, Lowell R. Wedemeyer, Richard Tanzer, Tanzer, Rosato, Samuels & Weisz, Rosario Perry and Peter L. Colt as Amici Curae on behalf of Plaintiffs and Appellants.

Robert M. Myers, City Attorney, Stephen S. Stark, Assistant City Attorney, Karl M. Manheim and Susan L. Carroll, Deputy City Attorneys, Michael Heumann, Mary Ann Yurkonis, Arnold Milton Paul, Jana Zimmer and Joel Martin Levy for Defendants and Respondents.

Ira Reiner, City Attorney (Los Angeles), Gary R. Netzer and Claudia McGee Henry, Assistant City Attorneys, Sharon L. Siedorf, Deputy City Attorney, George Agnost, City Attorney (San Francisco), Burk E. Delventhal, Alice Suet Yee Barkley and Thomas J. Owen, Deputy City Attorneys, Natalie E. West, City Attorney (Berkeley), and Penny Nakatsu as Amici Curiae on behalf of Defendants and Respondents.

**OPINION**

**REYNOSO, J.**—Appellants, the owners and prospective owner of a 42-unit apartment building in the City of Santa Monica,[1] appeal from a judgment upholding the city's denial of their claim of a vested right to remove the apartments from the rental housing market by converting the apartments to condominiums, without obtaining a permit for such removal under Santa Monica's rent control law. Appellants rest their claim on the city's approval of a tentative subdivision map for the conversion prior to the adoption of the rent control charter amendment, and their alleged subsequent expenditure of considerable sums to effect the conversion.

We agree with the rent control board's and the trial court's conclusion that the amount of money actually spent by appellants in reliance on the tentative map approval—only about $1,700 was expended between the date the map was approved and the date the rent control law was adopted—was inadequate to predicate a vested right to complete the conversion free of rent control. Thus, we need not decide whether the vested right doctrine generally applies to condominium conversions. Appellants' additional contention that the removal permit requirement conflicts with, and is accordingly preempted by, the state Subdivision Map Act is rebutted by language included in several provisions of the act. Those provisions explicitly disclaim any intention on the part of the Legislature to limit by implication local power to regulate condominium conversion.

We conclude that the judgment should be affirmed.

---

[1]The building is owned by appellant Santa Monica Pines, Ltd., a limited partnership of which SWYS Corporation is the general partner. Fredericks Development Corporation has contracted with the owners to purchase the property for $2.2 million under an escrow agreement conditioned on Santa Monica's "final approval" of conversion to condominiums.

I

The calendar of events influences our result. That calendar follows.

On January 15, 1979, the Santa Monica Planning Commission approved appellants' previously submitted tentative subdivision map. On February 27, 1979, appellants filed an application with the State Department of Real Estate for a final subdivision report. (Bus. & Prof. Code, §§ 11010, 11018.) On March 26, 1979, the final subdivision map was submitted to the Los Angeles County Engineers for a determination of its consistency with the tentative map, prior to consideration by the city council.

On April 10, 1979, article XVIII, an initiative rent control scheme, was adopted by the voters of Santa Monica as an amendment to the city's charter. Contained in the charter amendment is the provision challenged by appellants, section 1803, subdivision (t), which requires a landlord to obtain a permit from the rent control board before "remov[ing] a controlled rental unit from the rental housing market by demolition, *conversion,* or other means . . . ."[2] (Italics added.)

On May 11, 1979, fulfilling a condition attached to the tentative map approval, appellants paid a $42,000 conversion tax to the city. (See *The Pines* v. *City of Santa Monica* (1981) 29 Cal.3d 656 [175 Cal.Rptr. 336, 630 P.2d 521].)

---

[2]Section 1803, subdivision (t) of the Santa Monica City Charter provides:

"REMOVAL OF CONTROLLED RENTAL UNIT FROM RENTAL HOUSING MARKET: Any landlord who desires to remove a controlled rental unit from the rental housing market by demolition, conversion or other means is required to obtain a permit from the Board prior to such removal from the rental housing market in accordance with rules and regulations promulgated by the Board. In order to approve such a permit, the Board is required to make each of the following findings:

"(1) That the controlled rental unit is not occupied by a person or family of very low income, low income or moderate income.

"(2) That the rent of the controlled rental unit is not at a level affordable by a person or family of very low income, low income, or moderate income.

"(3) That the removal of the controlled rental unit will not adversely affect the supply of housing in the City of Santa Monica.

"(4) That the landlord cannot make a fair return on investment by retaining the controlled rental unit.

"Notwithstanding the foregoing provisions of this subsection, the Board may approve such a permit:

"(1) If the Board finds that the controlled rental unit is uninhabitable and is incapable of being made habitable in an economically feasible manner, or

"(2) If the permit is being sought so that the property may be developed with multifamily dwelling units and the permit applicant agrees as a condition of approval that the units will not be exempt from the provisions of this Article pursuant to Section 1801(c) and that at least fifteen (15) per cent of the controlled rental units to be built on the site will be at rents affordable by persons of low income."

On May 24, 1979, the Santa Monica engineers certified that the final map substantially conformed to the tentative map and that appellants had complied with "all provisions of local subdivision ordinances of the City of Santa Monica applicable at the time of approval of the tentative map. . . ." (See Gov. Code, §§ 66473, 66474.1.)

On June 26, the city council approved the final subdivision map, which was ultimately recorded on January 11, 1980.

On June 29, 1979, the city adopted ordinance No. 1127, in order to clarify and implement the rent control charter amendment. On the same day, appellants sought from the rent control board a vested right exemption from the removal permit requirement, pursuant to the provisions of the ordinance.[3]

The actual expenditures, like the calendar of events, are important. Appellants reported expenditures of $1,709 ($384 to the Department of Real Estate, $825 to the City of Los Angeles for "plan check fees," and $500 to the City of Santa Monica for engineering fees) between January 15 (the date of approval of the tentative map) and April 10, 1979 (the date of adoption of the rent control law). Thereafter, they spent another $55,515.59 ($2,543 to an engineering firm, $42,000 to the City of Santa Monica for the conversion tax, $5,250 to the city for subdivision map fees, and $5,722.59 to another engineering firm). On July 19, 1979, the rent control board heard and denied appellants' application for exemption.

Appellants subsequently petitioned the Superior Court of Los Angeles County for a writ of mandate pursuant to Code of Civil Procedure sections 1085 and 1094.5. (L.A. Super. Ct. No. WEC-062153.) The superior court

---

[3]The ordinance contains a number of provisions (§§ 4604-4609) relating to claims of vested rights.

Section 4605 sets out the "basic test": "In order to have secured a vested right to do or not to do a certain thing notwithstanding the provisions of this chapter, . . . a person must have secured the last governmental approval necessary to the performance of the desired thing, and, in good faith reliance on that approval, must have performed substantial work or incurred substantial liabilities in furtherance thereof. No right shall vest under this chapter unless all conditions precedent to obtaining all necessary governmental approvals have been satisfied as determined by the Interim Rent Control Board and Permanent Rent Control Board."

Section 4606 sets out a special presumption: "A property owner or subdivider is presumed to have a vested right to convert a controlled rental unit if, prior to April 10, 1979, a tentative tract map was approved and he or she submits satisfactory evidence of good faith reliance, including: [¶] 1) That application for a public report has been filed with the State Department of Real Estate; [¶] b) that necessary building permits and approvals by the Architectural Review board have been obtained. [¶] A vested right to proceed under this Chapter shall expire within three (3) years of final map approval as to all units not then sold; such unsold units are thereafter subject in all respects to this Chapter."

upheld the rent control board's decision, denying the requested writ. Judgment was entered on March 4, 1980, along with requested findings of fact and conclusions of law. Appellants filed a notice of appeal on May 12, 1980.

On May 15, 1980, appellants commenced a separate action for declaratory relief, again asserting their claim of a vested right to complete the conversion of the apartments without being subject to the rent control law. (L.A. Super. Ct. No. C-322806.) On April 21, 1981, the second superior court issued an interlocutory judgment of abatement on the ground of another action pending. Appellants also appealed this ruling.

The above-mentioned appeals have been consolidated.

I

■ Appellants' primary contention is that they acquired a vested right to complete the condominium conversion project, free of rent control, by allegedly expending over $40,000 following a tentative subdivision map approval of the project. The entire project was estimated to have a total cost of approximately $60,000. As will appear, this contention must be rejected because only about $1,700, an "insubstantial" amount in this context, was actually expended in reliance on the map approval.

Appellants acknowledge that the law of vested rights in California was recently and definitively enunciated by this court in *Avco Community Developers, Inc.* v. *South Coast Regional Com.* (1976) 17 Cal.3d 785 [132 Cal.Rptr. 386, 553 P.2d 546].[4] ■ We held that acquisition of a vested right to construct a building required: (1) a building permit, and (2) substantial expenditures in reliance on the building permit. They argue that where, as here, the potential condominium converter seeks only to subdivide a previously constructed building, and, consequently no building permit is required (compare *Hazon-Iny Development, Inc.* v. *City of Santa Monica* (1982) 128 Cal.App.3d 1 [179 Cal.Rptr. 860]), the "final" government

---

[4]We are aware of several recent decisions which decline to recognize tentative map approval as a "final approval" which may be relied upon under *Avco Community Developers, Inc.* v. *South Coast Regional Com., supra,* 17 Cal.3d 788, some requiring a final subdivision map approval (*Billings* v. *California Coastal Com.* (1980) 103 Cal.App.3d 729, 736 [163 Cal.Rptr. 288]; *Call* v. *Feher* (1979) 93 Cal.App.3d 434, 444 [155 Cal.Rptr. 387]), others requiring only fulfillment of all the conditions set out in the tentative map approval (*South Central Coast Regional Com.* v. *Charles A. Pratt Construction Co.* (1982) 128 Cal.App.3d 830, 845 [180 Cal.Rptr. 555]; *Tosh* v. *California Coastal Com.* (1979) 99 Cal.App.3d 388, 394 [160 Cal.Rptr. 170]). These decisions have not focused, though, on the character of the tentative map approval itself as a representation that a property may be subdivided upon satisfaction of stated conditions in the same way as a building permit represents that a building may be constructed.

permit needed as the foundation of a vested right is the tentative subdivision map.

■ Appellants rely heavily on *Youngblood* v. *Board of Supervisors* (1978) 22 Cal.3d 644 [150 Cal.Rptr. 242, 586 P.2d 556], in which we held that under the state Subdivision Map Act a county lacked discretion whether to approve a final subdivision map if the application showed the development substantially conformed to the tentative map and its attendant conditions. We explained that, under the act, "the date when the tentative map comes before the governing body for approval is the crucial date when that body should decide whether to permit the proposed subdivision. Once the tentative map is approved, the developer often must expend substantial sums to comply with the conditions attached to that approval. These expenditures will result in the construction of improvements consistent with the proposed subdivision, but often inconsistent with alternative uses of the land. Consequently it is only fair to the developer and to the public interest to require the governing body to render its discretionary decision whether and upon what conditions to approve the proposed subdivision when it acts on the tentative map. Approval of the final map thus becomes a ministerial act once the appropriate officials certify that it is in substantial compliance with the previously approved tentative map. (*Great Western Sav. & Loan Assn.* v. *City of Los Angeles, supra,* 31 Cal.App.3d 403, 411, 414 [107 Cal.Rptr. 359]; Longtin, Cal. Land Use Regulations, [1977] *op. cit. supra,* at p. 600.)" (*Id.,* at pp. 655-656.) Appellants urge that recognition of the tentative map approval as the "final" required approval thus comports with the equitable estoppel rationale of the vested-rights rule. (See *Raley* v. *California Tahoe Regional Planning Agency* (1977) 68 Cal.App.3d 965, 974-978 [137 Cal.Rptr. 699]; *Spindler Realty Corp.* v. *Monning* (1966) 243 Cal.App.2d 255, 264-269 [53 Cal.Rptr. 7].)[5]

We are reluctant to conclude, however, that approval of a subdivision map for condominium conversion necessarily leads to a vested right to freedom from subsequent rent control legislation. In the first place, appellants' argument seems based on the erroneous notion that they have a "vested right to obtain a vested right." There is no dispute over their authority to subdivide their apartment building as provided in the approved tentative map, that is, to sell fee interests in single apartment units. Rather, appellants

---

[5]Although section 4606 of Santa Monica Ordinance No. 1127 specifically creates a "presum[ption]" of a vested right to convert based on approval of a tentative map and "satisfactory evidence of good faith reliance" (see fn. 3, *ante*), appellants primarily rely on the general doctrine of vested rights. They make no reply to the city's argument that the city council had no authority to broaden property owners' "vested rights" against application of the *initiative* charter amendment. Our conclusion, *infra,* that plaintiffs failed to show adequate good faith reliance makes it unnecessary to discuss this special vested-rights rule separately.

claim they acquired the further right to transfer interests which are free of an intervening general regulation—the requirement that any owner of a "controlled rental unit" obtain a permit before removing it from the rental market.

But it is well established that the rights which may "vest" through reliance on a government permit are no greater than those specifically granted by the permit itself. (See *Avco Community Developers, Inc.* v. *South Coast Regional Com., supra,* 17 Cal.3d 785, 793; *Spindler Realty Corp.* v. *Monning* (1966) 243 Cal.App.2d 255, 264-265 [53 Cal.Rptr. 7].) In this case acceptance of appellants' premise would place them, and the purchasers of their condominiums, in a uniquely favorable position.

By comparison, a sale of the fee interest in a rented single-family home in Santa Monica at any time, even if completed before the rent control ordinance became effective, would leave the purchaser subject to the ordinance. It would not matter that both seller and purchaser had intended to remove the house from the rental market or that they made substantial expenditures with that object in mind. If the premises were a "controlled rental unit" within the ordinance's definition on the day the law went into effect, they would be covered.

We see no material difference in appellants' situation. For this reason alone, we question whether the approval of a subdivision map for condominium conversion can ever lead to a vested exemption from subsequent rent control laws.[6]

Furthermore, *Youngblood*'s analysis of "fair[ness] to the developer and to the public interest" (22 Cal.3d at p. 655, supra), may not be fully applicable to condominium conversions. Such projects generally require no substantial new construction, unlike more traditional developments which may require vast expenditures to comply with conditions attached to the tentative map.

■ The vested rights doctrine is " 'predicated upon estoppel of the governing body.' " (*Avco Community Developers, Inc.* v. *South Coast Regional Com., supra,* 17 Cal.3d at p. 793.) This is a principle of equitable

[6]The ordinance's requirement of a removal permit is not a "new condition" imposed on a subdivision in violation of *Youngblood*; it is not a restriction on the right to subdivide at all. Nor did approval of the tentative subdivision map imply that removal of units from the rental market was also "approved." The map act is primarily concerned with land use planning issues; it governs condominium conversions only to the extent of ensuring tenants' rights to *purchase* their apartments. The act leaves other aspects of conversion regulation to the local police power. (See discussion *post.*)

estoppel which may be applied against the government where justice and fairness require it. (*Raley* v. *California Tahoe Regional Planning Agency, supra,* 68 Cal.App.3d at p. 975.)

An equitable estoppel requiring the government to exempt a land use from a subsequently imposed regulation must include (1) a promise such as that implied by a building permit that the proposed use will not be prohibited by a class of restrictions that includes the regulation in question and (2) reasonable reliance on the promise by the promisee to the promisee's detriment. (See *Avco, supra,* 17 Cal.3d at p. 793.) Appellants here cannot have a vested right unless and until both of those elements of estoppel against the government are established.

As indicated, we need not decide whether we agree with petitioner that the tentative map approval may be considered akin to a building permit for construction. Even if the map approval is deemed tantamount to permission to withdraw the apartments from the rental market, the amount of money expended by appellants in reliance upon the tentative map approval was certainly inadequate *in this case* to predicate a vested right. Although they claim to have expended "over $40,000," that figure includes a $42,000 condominium license fee paid *after* the rent control law was adopted. The record thus discloses that only $1,709 was expended by appellants between the approval of the tentative subdivision map and the adoption of the rent control law.[7]

After April 10, 1979, appellants' expenditures were clearly a "calculated risk" (*Spindler Realty Corp.* v. *Monning, supra,* 243 Cal.App.2d at p. 265), since the charter amendment by its terms required without qualification that a permit be obtained for any removal of units from the rental market. That appellants were aware of the law's purported application to their building (none of the apartment units having been removed as yet) is demonstrated by their application for a vested rights determination on June 29, 1979, the very day the city promulgated regulations prescribing the manner of making such an application. That amount ($1,709) is clearly inconsequential when considered in light of the building's purchase price of $2.2 million. It does not appear that forcing appellants to absorb the $1,709 of legitimate reliance expenditures will cause them significant injury. Even as a percentage of the total cost of conversion (which mainly consisted of fees incurred in the course of obtaining various government approvals),

---

[7]Even if the fee had been paid before April 10, 1979, the significance of this sum might be diminished by a right to recover it back from the city if no conversions free of rent control were permitted to take place. (Cf. *County of Los Angeles* v. *Hartford Acc. & Indem. Co.* (1970) 3 Cal.App.3d 809 [83 Cal.Rptr. 740].) The existence or nature of such a right is not before us.

$1,709 does not comprise a "substantial" percentage of the total expenditure contemplated by appellants of over $60,000 (including the $42,000 paid after rent control was in effect). (See *Cooper* v. *County of Los Angeles* (1975) 49 Cal.App.3d 34, 41-43 [122 Cal.Rptr. 464]; *Cooper* v. *County of Los Angeles* (1977) 69 Cal.App.3d 529, 538-540 [122 Cal.Rptr. 464].) Appellants' claim of a vested right therefore fails.

## II

■ Appellants also contend that the state Subdivision Map Act preempts Santa Monica's attempt to regulate condominium conversions in connection with its rent control law. The state Constitution confers upon all cities and counties the power to "make and enforce within [their] limits all local, police, sanitary, and other ordinances and regulations *not in conflict* with the general laws." (Italics added.) (Cal. Const., art. XI, § 7.) It is true that the Subdivision Map Act contains some provisions referring or pertaining to condominium conversions. (E.g., Gov. Code, §§ 66424 [including condominium projects in definition of "subdivision"], 66416 [requiring tentative and final subdivision maps for conversion of five or more condominium units], 66427 [limiting ability of locality to disapprove tentative or final map based on design or location of the units absent an ordinance], 66427.1 [requiring as a condition for approval of final map provision of statutory notice to tenants and an opportunity to purchase their respective units], 66427.2 [exempting condominium conversions from application of statutes requiring a finding that the subdivision comports with applicable general and specific plans, "[u]nless [such] plans contain definite objectives and policies, specifically directed to the conversion of existing buildings into condominium projects . . ."].)

None of the statutory provisions directly conflicts with Santa Monica's condominium conversion removal permit requirements. The city argues persuasively that the removal permit requirement is crucial to the success of the rent control law, since large numbers of landlords might seek to avoid rent control by converting their units to condominiums. (See Comment, *Conversion of Apartments to Condominiums*: *Social and Economic Regulations Under the California Subdivision Map Act* (1980) 16 Cal.Western L.Rev. 466, 467-468; Note, *Municipal Regulation of Condominium Conversions in California* (1979) 53 So.Cal.L.Rev. 225, 228-229; see also *Flynn* v. *City of Cambridge* (1981) 383 Mass. 152 [418 N.E.2d 335, 338, 21 A.L.R.4th 1075].)

We have recently affirmed that the subject of rent control is within a city's police power. (*Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129 [130 Cal.Rptr. 465, 550 P.2d 1001].) The permit requirement's purpose of ef-

fectuating the city's rent control law appears distinct from the purposes of the state legislation (which are, fundamentally, to control the design and improvement of subdivisions and to protect the buying public from exploitation [*South Central Regional Com.* v. *Charles A. Pratt Construction Co., supra,* 128 Cal.App.3d at pp. 844-845]), and we do not discern in the legislation any purpose with which the removal permit requirement would "materially interfere." (*Id.,* at p. 142.) Moreover, the statutes themselves seem to affirmatively recognize the power of cities to regulate condominium conversions apart from the authority conferred on them by the Subdivision Map Act. (See, e.g., Gov. Code, § 66427.2 ["this section shall not diminish, limit or expand, other than as provided herein, the authority of any city, county, or city and county to approve or disapprove condominium projects"].) The restriction on removal from the rental housing market through condominium conversion, at issue here, with its evident, independent police power source and purpose, is therefore not preempted by the Subdivision Map Act.[8]

The judgment is affirmed.

Bird, C. J., Broussard, J., Grodin, J., and Johnson, J.,* concurred.

**MOSK, J.**—I dissent.

The majority declare they "need not decide" whether the tentative map approval is the equivalent of a building permit, which under *Avco Community Developers, Inc.* v. *South Coast Regional Com.* (1976) 17 Cal.3d 785 [132 Cal.Rptr. 386, 553 P.2d 546], would constitute acquisition of a vested right. They then proceed to deny relief to plaintiffs on the ground that expenditure of $43,709 is not a sufficient sum on which "to predicate a vested right." Thus their opinion rests not on any sound principle of law but on dollars and cents. How much more plaintiffs should have spent to earn their vested right my colleagues fail to say.

The majority declare the expenditure of $42,000 for the condominium tax and $1,709 for other alteration fees is "inconsequential when considered in

---

[8]Amici have raised some additional contentions unconnected with appellants' (e.g., that the removal permit requirement violates article I, section 1 of the California Constitution by depriving landlords of a fair return on their property, that the same constitutional provision is violated by a prohibition on conversion which regulates land ownership rather than use, and that the removal permit requirement constitutes an unconstitutional impairment of contract where a developer entered into a lien agreement to pay the city conversion tax prior to adoption of the rent control law). We have no occasion to consider them. (*E.L. White, Inc.* v. *City of Huntington Beach* (1978) 21 Cal.3d 497, 510-511 [146 Cal.Rptr. 614, 579 P.2d 505].)

*Assigned by the Chairperson of the Judicial Council.

light of the building's purchase price of $2.2 million.'' First of all, there is no law or rule of thumb that requires expenditure of some fixed percentage of the purchase price in order to qualify for a vested right. That $43,709 is "inconsequential" is purely the *ipse dixit* of the majority. But more importantly, it must be borne in mind that this is not a building to be constructed; it is a fully existing and completed 42-unit structure. Under some circumstances no expenditures are necessary in order to convert a rental apartment to a condominium: basically the process is merely a change in type of ownership. Here the sum of $43,709 represents a tangible indication of the good faith reliance of the plaintiffs on the map approval they had received from the city and their intent to proceed with changing from single to multiple ownership of the property.

It is significant that no further permits or approvals were required for an existing structure. Even if they were, as held unanimously by this court in *Youngblood* v. *Board of Supervisors* (1978) 22 Cal.3d 644 [150 Cal.Rptr. 242, 586 P.2d 556], it is the tentative map that is crucial: its approval, not any subsequent ministerial act such as approving a final map, determines when a developer may expend funds and achieve a vested right.

The majority choose in their calculations to denigrate the outlay of $42,000 to the city for the condominium tax. That the condominium tax was paid after the city rent control ordinance went into effect is of no consequence. The city accepted the payment and no part of it has been refunded. The city has had the use of that sum since it was paid. Conversely, the plaintiffs have expended that money and have been denied its use for the years during which this litigation has been pending. To accept the plaintiffs' payment of the condominium tax and then deny their right to convert to a condominium is a strange concept of municipal morality. Stranger still is the majority's approval of this conduct.

In short, this appears to be a classic case of a vested right having accrued in these plaintiffs. I would reverse the judgment.

Richardson, J.,* concurred.

Respondents' petition for a rehearing was denied June 21, 1984. Mosk, J., was of the opinion that the petition should be granted.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.