[No. D019886. Fourth Dist., Div. One. Mar. 18, 1996.]

HARBOR FUMIGATION, INC., Cross-complainant and Appellant, v. COUNTY OF SAN DIEGO AIR POLLUTION CONTROL DISTRICT, Cross-defendant and Respondent.

## Counsel

Gray, Cary, Ware & Freidenrich, Michael M. Hogan, John J. Lormon and David E. Watson for Cross-complainant and Appellant.

Lloyd M. Harmon, Jr., County Counsel, Diane Bardsley, Chief Deputy County Counsel, and Miriam E. Brewster, Deputy County Counsel, for Cross-defendant and Respondent.

## Opinion

McDONALD, J.—Harbor Fumigation, Inc. (Harbor) appeals a judgment declaring that the County of San Diego Air Pollution Control District (APCD) has authority to regulate emissions from the Tenth Avenue Marine Terminal facility (Facility) in San Diego in which methyl bromide is used as a pesticide. We conclude the relevant statutory language which directs the Department of Pesticide Regulation (DPR) to regulate the use of pesticides that are toxic air contaminants does not divest APCD of its regulatory authority. Accordingly, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

The Facility is owned by the San Diego Unified Port District (Port District). In 1992 Port District granted a temporary use and occupancy permit to Tenth Avenue Cold Storage Company (TACSC) to use the Facility for handling, storing and delivering imported fruit. Harbor entered into an agreement with TACSC to perform at the Facility required methyl bromide fumigation of imported fruit.

Methyl bromide is a gas commonly used as a pesticide to fumigate fruit and can be harmful to people who are exposed to it. It also contributes to the creation of smog and depletion of the earth's ozone layer. Methyl bromide is regulated as a "toxic air contaminant" (TAC) pursuant to Health and Safety Code[1] section 39655, subdivision (a), which statute is part of the Tanner Act (§ 39650 et seq.), enacted in 1983.

In late 1992 APCD notified Harbor and Port District that the Facility required permits from APCD to construct and operate equipment which would emit TAC's (such as methyl bromide) from the Facility into the ambient air. Harbor applied for the required permits, but its proposed uncontrolled emissions of methyl bromide from the Facility were deemed by APCD to pose an unacceptable health risk to the community surrounding the Facility. APCD requested Harbor to modify its application to include controls to mitigate these potential public health risks. Harbor applied for and obtained an interim variance from APCD's permit requirements which allowed it to fumigate without control equipment.

On February 25, 1993, the Environmental Health Coalition and the San Diego Unified School District filed separate petitions for writs of mandate and complaints for injunctive relief to prevent methyl bromide fumigations scheduled to occur at the Facility. The petitions were consolidated and an order restraining the fumigations was granted by the trial court. This court stayed the order, allowing fumigations to proceed subject to certain restrictive conditions suggested by APCD. The parties ultimately settled their dispute with Port District agreeing "to use its best efforts" to install an emission control system at the Facility. However, the settlement agreement did not resolve Harbor's cross-complaint against APCD for declaratory relief seeking a court determination that APCD has no jurisdiction to regulate its fumigation activities at the Facility.

Harbor's cross-complaint was decided by the court after a short cause trial. The court's judgment was entered on August 25, 1993, and stated in part:

---

[1]All further statutory references are to the Health and Safety Code unless otherwise specified.

"The only issue before the Court is whether or not the APCD has jurisdiction to regulate the emissions from the use of methyl bromide at the Tenth Avenue Marine Terminal facility.

"The Court finds that because the facility is a stationary source of air pollution, the Department of Pesticide Regulation (DPR) and the County Department of Agriculture's (CDA) authority to regulate the use of pesticides does not divest the APCD of its authority to regulate emissions." Harbor appeals this judgment.

## DISCUSSION

### I

### *Standard of Review*

■ Although neither party briefed the issue, the applicable standard of review on appeal in this case is de novo or independent review. There were no credibility issues at trial and the court decided only the limited question of law whether APCD has statutory jurisdiction to regulate emissions from the Facility into the ambient air. As an appellate court, we "conduct independent review of the trial court's determination of questions of law." (*Stratton* v. *First Nat. Life Ins. Co.* (1989) 210 Cal.App.3d 1071, 1083 [258 Cal.Rptr. 721].) Interpretation of a statute is a question of law. (*California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699 [170 Cal.Rptr. 817, 621 P.2d 856]; *California Ins. Guarantee Assn.* v. *Liemsakul* (1987) 193 Cal.App.3d 433, 438 [238 Cal.Rptr. 346]; *Los Angeles County Safety Police Assn.* v. *County of Los Angeles* (1987) 192 Cal.App.3d 1378, 1384 [237 Cal.Rptr. 920].) Further, application of the interpreted statute to undisputed facts is also subject to our independent determination. (*Rudd* v. *California Casualty Gen. Ins. Co.* (1990) 219 Cal.App.3d 948, 951 [268 Cal.Rptr. 624].)

### II

### *Rules of Statutory Construction*

The general rules of statutory construction are well developed. The Supreme Court recently restated these rules in *People* v. *Coronado* (1995) 12 Cal.4th 145 [48 Cal.Rptr.2d 77, 906 P.2d 1232] as follows: "To resolve whether defendant's interpretation of the relevant statutes is correct, we are guided by familiar canons of statutory construction. '[I]n construing a statute, a court [must] ascertain the intent of the Legislature so as to

effectuate the purpose of the law.' [Citation.] In determining that intent, we first examine the words of the respective statutes: 'If there is no ambiguity in the language of the statute, "then the Legislature is presumed to have meant what it said, and the plain meaning of the language governs." [Citation.] "Where the statute is clear, courts will not 'interpret away clear language in favor of an ambiguity that does not exist.' . . ." ' [Citation.] If, however, the terms of a statute provide no definitive answer, then courts may resort to extrinsic sources, including the ostensible objects to be achieved and the legislative history. [Citation.] 'We must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences.' " (*Id.* at p. 151.) We discussed our approach to statutory construction in *Rudd* v. *California Casualty Gen. Ins. Co., supra,* 219 Cal.App.3d at page 952, as follows: "The general principles which guide interpretation of a statutory scheme are equally settled. Our function is to ascertain the intent of the Legislature so as to effectuate the purpose of the law. [Citation.] To ascertain such intent, courts turn first to the words of the statute itself [citation], and seek to give the words employed by the Legislature their usual and ordinary meaning. [Citation.] When interpreting statutory language, we may neither insert language which has been omitted nor ignore language which has been inserted. [Citation.] The language must be construed in the context of the statutory framework as a whole, keeping in mind the policies and purposes of the statute [citation], and where possible the language should be read so as to conform to the spirit of the enactment. [Citation.]" With these general principles in mind, we turn to the relevant statutes.

III

*The Tanner Act*

A.

In 1983 the Legislature added section 39650 et seq., commonly known as the Tanner Act. The purpose of the Tanner Act was, in part, to "complement[] existing authority to establish, achieve, and maintain ambient air quality standards." (§ 39650, subd. (i).) That "existing authority" began in 1947 with the first California statutes to deal with air pollution control, now numbered section 39001 et seq. Section 39002 provides in part: "Local and regional authorities [e.g., APCD] have the primary responsibility for control of air pollution from all sources other than vehicular sources. The control of vehicular sources . . . shall be the responsibility of the State Air Resources

Board [ARB]. Except as otherwise provided in this division . . . , local and regional authorities may establish stricter standards than those set by law or by the state board for nonvehicular sources. . . ." The Tanner Act also noted that "the [California] Department of Food and Agriculture [DFA] has jurisdiction over pesticides to protect the public from environmentally harmful pesticides by regulating the registration and uses of pesticides." (§ 39650, subd. (g).) In 1991 the newly formed DPR assumed DFA's statutory authority to regulate pesticide use. (Gov. Code, § 12080.5; Food & Agr. Code, §§ 12500, 12752.2.)

The Tanner Act defines a "toxic air contaminant" as: "[A]n air pollutant which may cause or contribute to an increase in mortality or in serious illness, or which may pose a present or potential hazard to human health. A substance that is listed as a hazardous air pollutant pursuant to subsection (b) of Section 112 of the federal act (42 U.S.C. Sec. 7412(b)) is a toxic air contaminant. *A toxic air contaminant which is a pesticide shall be regulated in its pesticidal use by the [DPR]* pursuant to Article 1.5 (commencing with Section 14021) of Chapter 3 of Division 7 of the Food and Agricultural Code." (§ 39655, subd. (a), italics added.) ▮ Harbor contends that the phrase italicized above in section 39655, subdivision (a) clearly precludes APCD from regulating TAC's emitted from the Facility as a result of pesticidal use within the Facility, because it expressly states that DPR shall have regulatory authority over a pesticide/TAC "in its pesticidal use." (§ 39655, subd. (a).) However, our reading of that statute indicates its meaning is neither clear nor self-evident. Rather, on its face, we conclude that the language of section 39655, subdivision (a) is ambiguous. It can be read to mean either that (1) DPR has exclusive regulatory authority over emissions of pesticides/TAC's, interpreting the phrase "in its pesticidal use" broadly to include the disposal of pesticides/TAC's after their use as a pesticide has been completed, or (2) DPR has exclusive regulatory authority over the "use" of pesticides/TAC's, but not over emissions of waste gases from a stationary structure after the "pesticidal use" of the pesticides/TAC's within that structure has been completed. Harbor takes the former position and APCD the latter. Because we conclude the statutory language of section 39655 is ambiguous, we must apply the rules of statutory construction discussed above. In particular, we look to the statute's legislative history, general purpose and related statutory developments to discern the Legislature's intent in enacting section 39655.

## B.

At trial Harbor submitted a number of statements and reports by various legislators and committees in support of its contention that the legislative

intent of section 39655, subdivision (a) was to preclude ARB and local air pollution control districts (Districts) from regulating emissions from facilities after the use of pesticides/TAC's is completed. Of particular import is the report of the Senate Democratic Caucus on the Tanner Act bill, which states in part:

"The bill [i.e., the Tanner Act] contains a procedure for the Director of [DFA/DPR] to follow with regard to evaluating the health effects of the use of pesticides . . . that is parallel in most respects to that outlined above for toxic air contaminants. Major exceptions are:

"(1) The [D]irector [of DFA/DPR] must consult with county agricultural commissioners as well as local air pollution control districts [Districts] when preparing control measures;

"(2) The adoption of control measures is the responsibility of the [D]irector [of DFA/DPR]."

However, that report then supplements its discussion with an explanation of the effect of the last amendments to the Tanner Act bill on September 9, 1983, as follows:

"NOTE:   The 9/9/83 amendments:

   A.   To Section 1, Chapter 3.5, Toxic Air
       Contaminants:

     1.   Add to the intent language.

     2.   Provide that pesticides which are toxic air contaminants shall be regulated in their pesticidal use by the [DFA/DPR]. *But, as toxic air contaminants they [i.e., pesticides] shall be regulated by the [ARB]* based on a report by the Department of Health Services. . . ." (Italics added.)

Also, Harbor submitted a letter dated September 9, 1983, from the Tanner Act's principal Assembly co-author, Sally Tanner (see *Western Oil & Gas Assn.* v. *Monterey Bay Unified Air Pollution Control Dist.* (1989) 49 Cal.3d 408, 412, fn. 2 [261 Cal.Rptr. 384, 777 P.2d 157]), to the Assembly, stating: "In that regard, [the Tanner Act] provides that the [DFA] has regulatory responsibility for pesticides identified as toxic air contaminants while the [ARB] and the [Districts] continue to be responsible for the control of emissions from *all other airborne toxics*." (Italics added.) Harbor also submitted Tanner's July 12, 1983, statement to the Senate Committee on Government Organization, explaining: "Under [the Tanner Act], the authority to regulate toxic air emissions from pesticides is *exclusively* vested in the [DFA]. While the [ARB], with the full participation of the [DFA], would be

authorized to classify substances, including pesticides, as toxic air contaminants and establish recommended levels of ambient exposure, the [DFA] would have the *sole* authority to determine the need for, and to adopt and implement, emission controls on the application of pesticides." (Original italics.) It also submitted an ARB memorandum which expressed its understanding of the Tanner Act at that time, as follows: "The statute exempts from the ARB process toxic emissions from the application of pesticides, and creates a separate process administered by the [DFA] to evaluate and control toxic emissions from pesticides." Harbor also submitted DFA's statement regarding its understanding of the Tanner Act at the time, as follows: "The bill would require, among other things, the Director of Food and Agriculture, in consultation with the State Department of Health Services and the [ARB,] to evaluate health effects of pesticides emitted into the ambient air that may be hazardous to human health; to determine which pesticides are toxic air contaminants, and in consultation with county agricultural commissioners and [Districts], to develop and adopt control measures designed to reduce emissions from those pesticide sources. Department of Health Services and the [ARB] would be responsible for all other substances." At trial APCD apparently submitted no documentation of contemporaneous legislative history to counter that submitted by Harbor.

Based solely on the contemporaneous legislative history contained in the record, it would appear, as Harbor contends, that the legislative intent may have been for DFA to have exclusive jurisdiction over emissions into the ambient air of all pesticides which become TAC's after their use and that Districts have no jurisdiction over such emissions. However, that intent is not sufficiently clear in light of the Senate Democratic Caucus's report which states, as quoted above, that pesticides "as toxic air contaminants . . . shall be regulated by" the ARB. Further, the statements of individual legislators and regulatory agencies cannot be deemed conclusive regarding the legislative intent of the entire Legislature. We also review other factors to determine whether the purported legislative intent is consistent with (1) the overall purpose and scheme of the legislation, (2) other relevant statutes enacted before and after the statute in question, and (3) subsequent regulatory interpretation and application of the statute.

## C.

In 1987 the Legislature enacted supplemental air pollution control legislation, entitled the "Air Toxic 'Hot Spots' Information and Assessment Act of 1987" (Hot Spots Act). (§ 44300 et seq.) The Hot Spots Act imposes certain requirements on the operators of facilities which release pollution

into the ambient air, including submission to Districts of proposed "inventory plans" listing actual or potential emissions from facilities and procedures for monitoring or measuring the emissions. (§ 44340.) Although the Hot Spots Act does not directly address the question before us, one part (§ 44324) contains statutory language which, as APCD notes, indicates the Legislature interprets its own Tanner Act as giving APCD and other Districts the authority to regulate emissions from facilities in which pesticides are used. Section 44324 provides: "This part [i.e., the Hot Spots Act] does not apply to *any facility where economic poisons are employed in their pesticidal use, unless that facility was subject to district [e.g., APCD] permit requirements on or before August 1, 1987.* As used in this section, 'pesticidal use' does not include the manufacture or formulation of pesticides." (Italics added.) The only reasonable interpretation of this statute is that the Legislature must have understood the Tanner Act as giving the Districts the authority to regulate emissions from facilities in which pesticides are used, because it made the Hot Spots Act applicable to those facilities which were subject to District permits on or before August 1, 1987. (§ 44324.) Section 44324 expressly exempts facilities in which pesticides are used if they were not subject to District permits until after August 1, 1987. If the Legislature interpreted the Tanner Act as excluding those facilities entirely from any regulation by Districts, then section 44324 would have been entirely unnecessary. However, we presume the Legislature does not engage in idle or unnecessary acts. Accordingly, we conclude the language of section 44324 shows a legislative intent that facilities in which pesticides are used be subject not only to the Hot Spots Act but also to District regulation of emissions under the Tanner Act.

## D.

The overall purpose of the Tanner Act must be viewed in the context of existing air pollution control statutes originally enacted in 1947. In particular, as noted above, section 39002 provides in part: "Local and regional authorities [e.g., APCD] have the primary responsibility for control of air pollution from all sources other than vehicular sources." Thus, in order to give this statutory language its intended effect, APCD is presumed to have responsibility for controlling air pollution from all nonvehicular sources unless another statute clearly provides otherwise. Although Harbor contends section 39655 is one such statute, we conclude its statutory language is ambiguous. Given the ambiguity, we cannot conclude section 39655 necessarily precludes APCD from exercising its section 39002 "primary responsibility" to control air pollution from nonvehicular sources. On the contrary, we consider the legislative intent shown by the language of section 39002 to

weigh in favor of a conclusion that APCD has jurisdiction over emissions of TAC's from facilities in which pesticides are used.

E.

After enactment of the Tanner Act, there developed a consistent pattern of regulatory interpretation not only by ARB and Districts but also by DFA, that ARB and Districts have authority to regulate emissions of TAC's from facilities in which pesticides are used. Most significantly, we note that in 1989 DFA and ARB entered into a memorandum of understanding regarding the pesticide ethylene oxide (EtO), primarily used as a pesticide to sterilize medical equipment. The purpose of the memorandum was to set forth their mutual understanding regarding the regulation of that pesticide as an air pollutant. With respect to the pesticidal use of EtO, the memorandum "clarified" the respective roles of DFA and ARB as follows:

"2.   Both parties agree that the [DFA] will continue to regulate the application of EtO as a pesticide, including applicator exposure and other pesticidal use.

"3.   Both parties agree that the ARB will regulate EtO emissions into the ambient air subsequent to the pesticidal use of EtO on medical equipment for sterilization purposes."

This memorandum clearly indicates that DFA interpreted the Tanner Act as giving ARB (and presumably Districts) authority to regulate emissions from facilities in which pesticides, such as EtO, are used. This 1989 interpretation by DFA is binding upon DPR, which in 1992 became DFA's statutory successor in the regulation of pesticide use.

Further, ARB and Districts have for many years interpreted the Tanner Act as giving them authority to regulate emissions from facilities in which pesticides are used. APCD submitted at trial the declaration of the general counsel for ARB, Michael Kenny, which stated in part:

"4.   It has been the [ARB's] longstanding opinion that methyl bromide fumigation chambers are subject to local air pollution control district [e.g., APCD] permit requirements and rules and regulations as long as the pesticidal activities which occur within the chambers are not regulated by the air pollution control districts [e.g., APCD].

"5.   The [DPR] . . . is required to identify and control toxic air contaminants which are pesticides *in their pesticidal use*. Once a pesticide has

performed its fumigation role and is vented from the chamber into the ambient air, however, it has become a waste gas and is no longer engaged in a 'pesticidal use.' At this point, an air pollution control district [e.g., APCD] may legitimately regulate emission of methyl bromide from the chamber.

"6. This issue has been discussed at length by the [ARB] with the [DPR]. The [DPR] has concurred with the [ARB's] characterization of a local air pollution control district's authority with regard to methyl bromide fumigation chamber emissions into the ambient air." (Original italics.)

Harbor failed to submit any declaration or other documentation to counter Kenny's statement that DPR "has concurred" with ARB's interpretation of the Tanner Act as giving Districts authority to regulate emissions of methyl bromide waste gas from fumigation chambers after the pesticidal use of methyl bromide within that chambers is completed. Accordingly, we presume the current position of ARB and DPR is that they believe the Tanner Act allows Districts to regulate emissions of methyl bromide from facilities after its pesticidal use within those facilities is completed.

APCD also submitted at trial declarations from representatives of certain Districts and other documentation showing that the San Francisco Bay Area, South Coast, Monterey Bay and San Joaquin Valley Districts have consistently asserted their authority to regulate emissions of methyl bromide from facilities in which it is used as a pesticide.

F.

Despite the long-standing positions of ARB, DPR and Districts regarding the authority of Districts to regulate the emission of pesticides/TAC's (e.g., methyl bromide) from facilities in which pesticides are used, the Legislature has not acted to amend the Tanner Act or to otherwise show that this was not its intent in enacting the Tanner Act. In fact, in 1992 the Legislature amended the statute in question, section 39655, without modifying the ambiguous phrase which gave rise to the instant matter. To the extent DPR is not concerned with the emission of pesticides into the ambient air, a statutory interpretation that the ARB and Districts have no authority to regulate these emissions would leave unregulated emissions from the Facility. We find no indication the Legislature intended this result. Although we are not bound to accept the interpretation or position of the involved regulatory agencies, we must presume the Legislature was aware of the practice of ARB and Districts in regulating the emission of pesticides/TAC's from facilities in which pesticides are used, and its failure to amend the Tanner Act to preclude such regulation "is a strong indication the [ARB's

and Districts'] administrative practice [is] consistent with underlying legislative intent." (*DeYoung* v. *City of San Diego* (1983) 147 Cal.App.3d 11, 18-19 [194 Cal.Rptr. 722]; see also *Lute* v. *Governing Board* (1988) 202 Cal.App.3d 1177, 1182-1183 [249 Cal.Rptr. 161].)

## G.

APCD also notes that its position of regulating emissions of TAC's from facilities in which pesticides are used is consistent with the United States Ninth Circuit Court of Appeals decision in *People of State of Cal.* v. *Department of the Navy* (9th Cir. 1980) 624 F.2d 885 (hereafter *Navy*). In that case the court affirmed the district court's holding in *People of State of Cal., etc.* v. *Dept. of Navy* (N.D.Cal. 1977) 431 F.Supp. 1271, that ARB had authority under the federal Clean Air Act (42 U.S.C. § 7401 et seq.) to regulate emissions from stationary test cells in which detached jet engines were operated and tested. (*Navy, supra,* at p. 889.) The test cells in question consisted of large concrete structures with an open vertical tower at each end for air inlet and exhaust outlet. (*Id.* at p. 887.) In *Navy*, the Navy contended its test cells were exempt from ARB regulation, citing section 233 of the Clean Air Act (42 U.S.C. § 7573) which in 1980 provided: "No State or political subdivision thereof may adopt or attempt to enforce any standard respecting emissions of any air pollutant from any aircraft or engine thereof unless such standard is identical to a standard applicable to such aircraft under this part." (*Navy, supra,* at p. 887.) Adopting the preemption doctrine applied by the district court, the court held ARB regulation of emissions from engines in test cells was not preempted by the Clean Air Act, provided ARB's regulations "can be met without affecting the design, structure, operation, or performance of the aircraft engine." (*Id.* at p. 888.) Applying this preemption doctrine to the test cells in question, the court concluded: "The test cells here are substantial concrete structures. Even though the pollution comes from a jet engine, if the pollution can be abated before it leaves the test cell by means which do not require modification of the engine, then there is no reason why state regulation may not apply." (*Id.* at p. 889.)

Our situation is analogous. Like the engines operated within the test cells in *Navy*, the use of methyl bromide as a pesticide within the Facility is beyond the scope of APCD's regulatory authority. However, when the respective waste gases (i.e., engine exhaust in *Navy* and methyl bromide in this case) leave the structures, they become emissions into the ambient air which are subject to regulation by ARB and APCD. Here, although APCD cannot regulate how a pesticide is used within the Facility (and thus does not

run afoul of DPR's jurisdiction over pesticide use), once the use of a pesticide is completed and its waste gas emitted into the ambient air from the Facility, then APCD's regulatory jurisdiction under the Tanner Act and otherwise begins.

## H.

■ Harbor contends that various other statutory provisions indicate a legislative intent to preclude APCD from regulating emissions of methyl bromide from the Facility. In particular, it cites section 39650, subdivision (g), which provides that DFA (now DPR) has "jurisdiction over pesticides to protect the public from environmentally harmful pesticides by regulating the registration and uses of pesticides." However, this statutory language merely expresses the Legislature's intent to give DFA (now DPR) regulatory authority over the use and application of pesticides with the objective of protecting the public. It does not indicate any express legislative intent to preclude ARB or Districts from regulating emissions from facilities in which pesticides are used.

Harbor also cites Food and Agricultural Code section 14024, subdivision (a), which provides: "For those pesticides for which a need for control measures has been determined . . . , the director [of DPR], in consultation with the agricultural commissioners and air pollution control districts [e.g., APCD] and air quality management districts in the affected counties, shall develop control measures designed to reduce emissions sufficiently so that the source will not expose the public to the levels of exposure which may cause or contribute to significant adverse health effects. Where no demonstrable safe level or threshold of significant adverse health effects has been established by the director, the control measures shall be designed to adequately prevent an endangerment of public health through the application of best practicable control techniques." Although this language could be interpreted as indicating a legislative intent that DPR regulate emissions of pesticides and that Districts act only in an advisory capacity regarding emissions of pesticides, that interpretation appears to be contradicted when subdivision (b) of Food and Agricultural Code section 14024 is read in conjunction with subdivision (a) of that section. Subdivision (b) reads:

"Best practicable control techniques may include, but are not limited to, the following:

"(1) Label amendments.

"(2) Applicator training.

"(3) Restrictions on use patterns or locations.

"(4) Changes in application procedures.

"(5) Reclassification as a restricted material.

"(6) Cancellation." (Food & Agr. Code, § 14024, subd. (b).)

These alternative "control techniques" suggested by the Legislature show that it was concerned primarily, if not exclusively, with the method of application of pesticides and protection of the workers who apply pesticides. Even though DPR may be charged with a duty to consider the adverse effects of pesticides on the general public and the environment, there is no indication the Legislature in enacting Food and Agricultural Code section 14024 intended to preclude Districts from regulating emissions of pesticides/ TAC's from facilities in which pesticides are used.

Harbor also cites Food and Agricultural Code section 14022, subdivision (a), which directs DPR to evaluate the health effects of pesticides, stating: "In consultation with the Office of Environmental Health Hazard Assessment and the [ARB], the director [of DPR] shall evaluate the health effects of pesticides which may be or are emitted into the ambient air of California and which may be determined to be a toxic air contaminant which poses a present or potential hazard to human health. Upon request of the [ARB], the director shall include a pesticide for evaluation." However, again, to the extent DPR is to be concerned with emissions of pesticides into the ambient air, this concern is one shared with ARB and Districts and one over which they have concurrent jurisdiction. These statutory provisions cited by Harbor do not preclude ARB and Districts from regulating emissions of pesticides/ TAC's from facilities in which pesticides are used.[2]

I.

In summation, we conclude the weight of the evidence regarding legislative intent supports an interpretation of section 39655, subdivision (a) that does not preclude APCD from regulating emissions of pesticides/ TAC's, such as methyl bromide, from the Facility under its "primary responsibility" to control air pollution from all nonvehicular sources. (§ 39002.) Although our conclusion admittedly may be subject to differing views, we nevertheless interpret DPR's exclusive jurisdiction to regulate a pesticide/

---

[2]To the extent Harbor cites and relies on other provisions of the Food and Agricultural Code (e.g., Food & Agr. Code, § 14023, subd. (e)), we likewise conclude that those provisions fail to express or otherwise show an intent of the Legislature to preclude APCD from regulating emissions of pesticides/TAC's from facilities in which pesticides are used.

TAC "in its pesticidal use" as being limited to its actual application or use, and after such use DPR has, at best, concurrent jurisdiction over emission of the pesticide/TAC. (§ 39655, subd. (a).) It is DPR's primary purpose to regulate the *use* of pesticides in a manner safe to human beings and the environment, while it is a primary purpose of ARB and Districts to regulate emissions of TAC's, including pesticides, into the ambient air to protect human beings and the environment. Accordingly, we conclude APCD has authority to regulate the emission of methyl bromide from the Facility into the ambient air. Duplicate regulation by multiple regulatory agencies is perhaps unnecessary and certainly may be inefficient. However, if the Legislature did not intend possible duplicate regulation, it is a simple matter for the Legislature to clarify the ambiguity it has created.

DISPOSITION

The judgment is affirmed.

Kremer, P. J., and Nares, J., concurred.