64 Cal.App.4th 785 (1998)
SAN DIEGO GAS & ELECTRIC CO., Plaintiff and Respondent,
v.
CITY OF CARLSBAD et al., Defendants and Appellants.
Docket No. D027407.
Court of Appeals of California, Fourth District, Division One.
June 9, 1998.
*788 COUNSEL
Ronald R. Ball, City Attorney, and Jane Mobaldi, Deputy City Attorney, for Defendants and Appellants.
Brown, Winfield & Canzoneri, J. Kenneth Brown, John H. Holloway and Scott H. Campbell as Amici Curiae on behalf of Defendants and Appellants.
Luce, Forward, Hamilton & Scripps, Jeffrey A. Chine, Stephenson, Worley, Garratt, Schwartz, Heidel & Prairie and Donald R. Worley for Plaintiff and Respondent.
OPINION
HUFFMAN, Acting P.J.
In this declaratory relief action, the trial court granted summary judgment to plaintiff and respondent San Diego Gas & Electric Co. (SDG&E) and against defendants and appellants the City of Carlsbad and its officials (City), on the ground that City's effort to regulate, by way of City's floodplain management regulations (Carlsbad Mun. Code *789 (CMC), ch. 21.110 et seq.), the deposit of sand dredged from a lagoon adjacent to SDG&E's power plant upon state beaches within the city limits, was invalid as preempted by the constitutional and statutory scheme applicable to the State Public Utilities Commission (PUC). (Cal. Const., art. XII, § 8; Pub. Util. Code, § 701 et seq.)[1]
City appeals, contending it should have concurrent jurisdiction with the PUC over disposition of the spoils of SDG&E's dredging operation because (1) the PUC has not taken any action to regulate this specific activity. (2) disposal of sand produced by dredging should not be considered to be an essential utility facility or activity which would be clearly subject to PUC control, and/or (3) general police power allows such health and safety regulation. Applying standard rules for determining if state law preempts local regulation, we conclude the subject constitutional and statutory provisions grant power to the PUC, not to City, to place restrictions on this activity.

FACTUAL AND PROCEDURAL BACKGROUND
At all relevant times, SDG&E, a public utility company, owned and operated the Encina Electrical Generating Plant (the plant), which supplies electricity to approximately 950,000 customers in and around City. The plant is located on land SDG&E owns on Agua Hedionda Lagoon (the lagoon) in the City. SDG&E extensively dredged the westernmost portion of the lagoon in 1952-1954 when it constructed the plant, and continues to do so to keep the lagoon open so that channeled and accumulated sea water may be used for the essential purpose of cooling the plant's electric generating units. Normal tidal and wave action causes sand to migrate southward along the coast, building up inside the lagoon and its inlet. Should routine maintenance dredging be discontinued, the risk of lagoon closure, plant shutdown, and ecological damage is increased.
The proceeds from dredging, sediment from the lagoon floor, are termed dredging spoils and are piped westward and deposited on the adjacent coastline. The coastal area involved here is a state beach located within City's boundaries. The beach is owned by the State Lands Commission (SLC) and operated by the State Parks and Recreation Department (DPR). City has no ownership interest in it. Pursuant to a lease from the SLC and permits from the DPR and the California Coastal Commission, SDG&E deposits dredging spoils (sand) on the state beach area. Historically, SDG&E *790 has deposited the spoils near the mouth of the lagoon and its inlet. SDG&E has also obtained permits for this activity from the United States Army Corps of Engineers and the State Regional Water Quality Control Board.
Beaches in the City area have sustained extensive erosion and sand loss in recent years. In 1983, City adopted the Agua Hedionda segment of its coastal zone plan, to establish a permit scheme to regulate coastal development, including dredging. (CMC, ch. 21.80.) The purpose of the ordinance was to implement coastal preservation goals as set forth in the California Coastal Act of 1976. (Pub. Resources Code, § 30000 et seq.) Such goals include protection of residents and minimization of costly flood control expenditures, which is also consistent with federal legislative goals found in the National Flood Insurance Act of 1968 (42 U.S.C. § 4001 et seq.), which required local entities to enact such regulations. Local entities which did not enact such development limitations effectively precluded their residents from being eligible for federal assistance in case of flooding. (42 U.S.C. § 4002(b)(3).)
In 1988, City adopted its floodplain management regulations (floodplain ordinance), designed to conserve natural resources, prevent flooding, and prevent and control beach and shore erosion. (CMC, ch. 21.110.) The preamble of the floodplain ordinance relies as authority on the comprehensive planning and zoning law of Government Code section 65302 et seq., which is designed to promote public health, safety and welfare. This ordinance provides that no structure or land in certain areas of City may be "constructed, located, extended, converted or altered" without a special use permit, and that failure to obtain a required permit is a misdemeanor. (CMC, § 21.110.080.)
Under protest, SDG&E obtained in 1993 a City special use permit for its maintenance dredging of the outer lagoon area, for a five-year period. The permit gives City officials the power to approve the dredge plan and the location of the deposit of spoils. In September 1995, as a condition of the permit, the city engineer ordered SDG&E to place the first 150,000 cubic yards of dredge spoils (later modified to 100,000 cubic yards, out of an anticipated 450,000 total cubic yards) on a northerly section of the state beach (North Beach), about a mile north of the mouth of the lagoon. North Beach was a critically eroded part of the shoreline. SDG&E did not appeal the conditions of the permit, but later began dredging in violation of those conditions, dumping sand elsewhere. City issued a stop work notice and sent police officers to enforce it. SDG&E then appealed the permit conditions to the city council, which amended but upheld the conditions.
*791 In October 1995, SDG&E filed this action for declaratory and other relief, to challenge City's jurisdiction over the dredging operation.[2] City responded with a cross-complaint seeking similar relief in its favor. SDG&E's request for a preliminary injunction was denied. In March 1996, City obtained an advisory opinion from the PUC legal department to the effect that City would not be preempted from regulating the placement of sand on beaches within its limits resulting from SDG&E dredging operations, assuming that the issues presented did not involve SDG&E's right to perform dredging in the first instance, nor whether such regulation would render the dredging ineffective and thus make operation of the plant infeasible. The author of the advisory letter noted that, even though under case law SDG&E might be required to obtain a local permit, the PUC "retains paramount jurisdiction vis-a-vis the city over the project."
Before the scheduled trial date, SDG&E brought a motion for summary judgment on the declaratory relief request (dismissing other causes of action for injunctive relief, etc.), and City did likewise, seeking a ruling on whether it had the authority to regulate the deposit of sand dredged by SDG&E on beaches within its boundaries. SDG&E's expert oceanographer, Scott A. Jenkins, gave his opinion that it would be futile to deposit sand "immediately" to the north of the lagoon and jetty, as it would naturally migrate southward and require further dredging. City's official, defendant City Engineer Lloyd Hubbs, stated that no evidence exists that placing sand on North Beach as requested, one mile north of the lagoon, will increase the flow of sand back to the lagoon.
Ultimately, SDG&E's motion was granted and City's denied, the court ruling that there were no triable issues of fact as to whether City's floodplain ordinance and permit procedure were void as to SDG&E, "as they constitute an attempt to regulate an essential utility facility or activity under the guise of protecting public safety." The trial court declined to grant declaratory relief at SDG&E's request to the effect that City should have pursued grievance proceedings through the PUC, as that issue had not been raised in the pleadings. Judgment was entered accordingly and City appeals.[3] By *792 permission, 62 California cities have filed an amici curiae brief in support of City's position.[4] (Cal. Rules of Court, rule 14.)

DISCUSSION
(1) Because the trial court's decision was rendered in the context of cross-summary judgments (Code Civ. Proc., § 437c), our standard of review is well settled: "[T]he applicable standard of review on appeal in this case is de novo or independent review. There were no credibility issues at trial and the court decided only ... limited question[s] of law[.] As an appellate court, we `conduct independent review of the trial court's determination of questions of law.' [Citation.] Interpretation of a statute is a question of law. [Citations.] Further, application of the interpreted statute to undisputed facts is also subject to our independent determination. [Citation.]" (Harbor Fumigation, Inc. v. County of San Diego Air Pollution Control Dist. (1996) 43 Cal. App.4th 854, 859 [50 Cal. Rptr.2d 874].)
We first set forth rules for examining if a particular area of regulation has been fully occupied by statutory or constitutional law, and then analyze the respective roles of state and local government concerning utility regulation and coastal management in this factual context.

I

Preemption Analysis
(2) In Sherwin-Williams Co. v. City of Los Angeles (1993) 4 Cal.4th 893, 897-898 [16 Cal. Rptr.2d 215, 844 P.2d 534] (Sherwin-Williams), the Supreme Court set forth these general principles governing preemption analysis, both express and implied: "Under article XI, section 7 of the California Constitution, `[a] county or city may make and enforce within its limits all *793 local, police, sanitary, and other ordinances and regulations not in conflict with general laws.' [¶] `If otherwise valid local legislation conflicts with state law, it is preempted by such law and is void. [Citations.] [¶] `A conflict exists if the local legislation "`duplicates, contradicts, or enters an area fully occupied by general law, either expressly or by legislative implication.'"' [Citations.] [¶] Local legislation is `duplicative' of general law when it is coextensive therewith. [Citation.] [¶] Similarly, local legislation is `contradictory' to general law when it is inimical thereto. [Citation.] [¶] Finally, local legislation enters an area that is `fully occupied' by general law when the Legislature has expressly manifested its intent to `fully occupy' the area [citation], or when it has impliedly done so in light of one of the following indicia of intent: `(1) the subject matter has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of state concern; (2) the subject matter has been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the' locality. [Citations.]" (Italics added, fn. omitted.)
(3) Statutes must be read in the context of related constitutional and statutory provisions. (Dyna-Med, Inc. v. Fair Employment & Housing Com. (1987) 43 Cal.3d 1379, 1387 [241 Cal. Rptr. 67, 743 P.2d 1323].) Where there is an apparent conflict between two statutes, the courts will attempt to harmonize them by giving effect to both statutes if possible. (Conway v. City of Imperial Beach (1997) 52 Cal. App.4th 78, 84-85 [60 Cal. Rptr.2d 402].) (4) "In determining whether the Legislature has preempted by implication to the exclusion of local regulation we must look to the whole purpose and scope of the legislative scheme." (People ex rel. Deukmejian v. County of Mendocino (1984) 36 Cal.3d 476, 485 [204 Cal. Rptr. 897, 683 P.2d 1150].) In general, courts are cautious in applying the doctrine of implied preemption: "[I]n view of the long tradition of local regulation and the legislatively imposed duty to preserve and protect the public health, preemption may not be lightly found." (Id. at p. 484.) Where local legislation clearly serves local purposes, and state legislation that appears to be in conflict actually serves different, statewide purposes, preemption will not be found. (Santa Monica Pines, Ltd. v. Rent Control Board (1984) 35 Cal.3d 858, 868-869 [201 Cal. Rptr. 593, 679 P.2d 27].)
Determining whether local legislation has entered an area "fully occupied" by general law first requires determining what is the relevant field of *794 regulation: "`If the definition is narrow, preemption is circumscribed; if it is broad, the sweep of preemption is expanded.' (California Water & Telephone Co. v. County of Los Angeles (1967) 253 Cal. App.2d 16, 27-28 [61 Cal. Rptr. 618]; [citation].)" (Candid Enterprises, Inc. v. Grossmont Union High School Dist. (1985) 39 Cal.3d 878, 886, fn. 4 [218 Cal. Rptr. 303, 705 P.2d 876].) To determine the applicable field of regulation, we next compare statewide utility regulations to local police power authorizations.

II

Utility Regulation

A

State Regulation
Under California Constitution, article XII, section 3, a private utility corporation such as SDG&E is considered to be a public utility subject to control by the Legislature. California Constitution, article XII, section 8 establishes, in pertinent part, the permissible scope of local regulation in the utility context: "A city, county, or other public body may not regulate matters over which the Legislature grants regulatory power to the [PUC]."
Regulation of public utilities by the PUC is generally authorized by section 701: "The [PUC] may supervise and regulate every public utility in the State and may do all things, whether specifically designated in this part or in addition thereto, which are necessary and convenient in the exercise of such power and jurisdiction." Section 768 is generally relevant here, as pertaining to the PUC's power to require health and safety measures in the operation of utilities: "The commission may, after a hearing, require every public utility to construct, maintain, and operate its line, plant, system, equipment, apparatus, tracks, and premises in a manner so as to promote and safeguard the health and safety of its employees, passengers, customers, and the public. The commission may prescribe, among other things, the installation, use, maintenance, and operation of appropriate safety or other devices or appliances, including interlocking and other protective devices at grade *795 crossings or junctions and block or other systems of signaling. The commission may establish uniform or other standards of construction and equipment, and require the performance of any other act which the health or safety of its employees, passengers, customers, or the public may demand...."[5]
Section 2902 states that notwithstanding comprehensive statewide utility regulation, certain existing municipal powers are retained by municipalities, as follows: "This chapter shall not be construed to authorize any municipal corporation to surrender to the commission its powers of control to supervise and regulate the relationship between a public utility and the general public in matters affecting the health, convenience, and safety of the general public, including matters such as the use and repair of public streets by any public utility, the location of the poles, wires, mains, or conduits of any public utility, on, under, or above any public streets, and the speed of common carriers operating within the limits of the municipal corporation." (§ 2902; see Southern Cal. Gas Co. v. City of Vernon (1995) 41 Cal. App.4th 209, 217-218 [48 Cal. Rptr.2d 661] (Vernon).)

B

Local Regulation
The general authorization for a local entity's police power is found in California Constitution, article XI, section 7: "A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." California Constitution, article XI, section 9, subdivision (b) permits municipalities to prescribe conditions and regulations for the operation of public utility works by private entities.
Under CMC section 21.110.080, no structure or land in certain areas of City may be "constructed, located, extended, converted or altered" without a special use permit. The methods of reducing flood losses contained in the floodplain ordinance include "[c]ontrolling filling, grading, dredging and other development which may increase flood damage" (CMC, § 21.110.040(4)), and "development" is defined in the ordinance as including dredging. (CMC, § 21.110.050(10).) A special use permit is required *796 before development begins in flood hazard areas. (CMC, § 21.110.130.) An appeal procedure to the city council is provided by CMC section 21.110.240(b).

C

Case Law
Case law has established the parameters of these various forms of regulation. Recently, the Supreme Court in San Diego Gas & Electric Co. v. Superior Court (1996) 13 Cal.4th 893, 943-944 [55 Cal. Rptr.2d 724, 920 P.2d 669] rejected an argument that the PUC had not expressly or impliedly asserted exclusive jurisdiction over certain issues (powerline electric and magnetic fields hazards). The court stated that the plaintiffs in that case had correctly recognized that the PUC "has plainly asserted its jurisdiction over all regulated electric utilities vis-a-vis local agencies" (Id. at pp. 943-944, original italics, fn. omitted), even though generally "`[i]t has never been the rule in California that the commission has exclusive jurisdiction over any and all matters having any reference to the regulation and supervision of public utilities.' [Citing Vila v. Tahoe Southside Water Utility (1965) 233 Cal. App.2d 469, 477 [43 Cal. Rptr. 654], italics omitted.]" (San Diego Gas & Electric Co. v. Superior Court, supra, 13 Cal.4th at p. 944.) An effort by those plaintiffs to say that a separate rule should apply to local courts than to local agencies as to preemption was thus rejected by the Supreme Court. (Ibid.) This authority indicates that preemption is normally the rule in this context, as quoted by the Supreme Court from the Vila case: "`California courts have frequently proclaimed concurrent jurisdiction in the superior court over controversies between utilities and others not inimical to the purposes of the Public Utility Act.'" (Ibid., quoting Vila v. Tahoe Southside Water Utility (1965) 233 Cal. App.2d 469, 477 [43 Cal. Rptr. 654], italics added.)
In Vernon, supra, 41 Cal. App.4th 209, the Court of Appeal considered whether a municipality could regulate the design and construction of a proposed gas pipeline, notwithstanding the PUC's regulatory power in that area. The court ruled that the regulation of pipeline safety is within the exclusive jurisdiction of the PUC, as follows: "In sum, under the Constitution a city may not regulate matters over which the PUC has been granted regulatory power, the Legislature has granted regulatory power to the PUC over the safety of gas pipelines, and the PUC in fact has promulgated rules on this subject. Therefore, Vernon cannot purport to regulate the design or *797 construction of the proposed pipeline under the guise of ensuring the pipeline's safety. [¶] The goal of statewide uniformity in this area would be defeated if a municipality such as Vernon could enlarge upon the standards promulgated by the PUC in its General Order. If Vernon believes the PUC's standards are inadequate, it should direct its concerns to that entity." (Id. at p. 217.)
In Vernon, supra, 41 Cal. App.4th 209, the Court of Appeal also decided that the city could not rely on section 2902 to justify its attempt to regulate the design and construction of the pipeline on safety grounds, because "... viewing this statute in the context of the related constitutional and statutory provisions discussed above [citation], we conclude the design and construction of the proposed pipeline are matters within the regulatory purview of the PUC, not the municipality." (41 Cal. App.4th at p. 218.)
In Orange County Air Pollution Control Dist. v. Public Util. Com. (1971) 4 Cal.3d 945 [95 Cal. Rptr. 17, 484 P.2d 1361] (OCAPCD), the Supreme Court dealt with the issue of "[w]hether the authority conferred upon the [PUC] to grant permission to construct and operate privately owned electric generating units supersedes, in cases of conflict, the authority conferred upon an air pollution control district to condition construction of such units upon compliance with district emission controls."[6] (Id. at p. 947.) The court ruled that "neither the commission nor the district has exclusive or paramount authority," and "[s]ubject to judicial review provided by law, a utility must comply with the rules and regulations of both the commission and the district." (Ibid.) The court reasoned in part as follows: "The [PUC] correctly stated [in its decision] that local ordinances are controlled by and subject to general state laws and the regulations of statewide agencies regarding matters of statewide concern. Accordingly, the commission has been held to have paramount jurisdiction in cases where it has exercised its authority, and its authority is pitted against that of a local government involving a matter of statewide concern. [¶] Where its jurisdiction conflicts with other than a local agency, commission directives have not been given such controlling effect. The commission, for example, has broad authority to promote the safe operation of utilities. Yet compliance with commission directives does not preclude a jury's finding that the commission's standards did not constitute a minimum standard of reasonable care. [Citations.]" (Id. at pp. 950-951, original italics, fns. omitted.)
*798 In a footnote in OCAPCD, supra, 4 Cal.3d 945, the Supreme Court gave examples of matters of both local and statewide concern, as follows: "On many occasions a matter which is local in geographical effect has been declared one of statewide concern, vesting paramount jurisdiction in the commission. Thus the business of supplying telephone service (and hence the right to control franchises) [citation], the construction and maintenance of telephone lines within a city [citation], and the control of city streets at railroad grade crossings [citations] have all been declared matters of statewide concern. [¶] Similarly, in California Water & Telephone Co. v. County of Los Angeles [1967] 253 Cal. App.2d 16 [61 Cal. Rptr. 618], relied upon by the commission, the court found that `the construction, design, operation and maintenance of public water utilities is a matter of state-wide concern....' (Id. at p. 30.) Hence, the court declared, the county's water ordinance must be void, since local legislation based on the police power is subject to general state law on matters of state-wide concern. (Id. at pp. 27-28.) In the other case cited by the commission, Los Angeles Ry. Corp. v. Los Angeles [1940] 16 Cal.2d 779, 787 [108 P.2d 430], this court based its jurisdictional holding on the fact that `the regulation and operation of the street cars of the plaintiff over the territory involved is not a matter solely of local concern and is not, therefore, a municipal affair.'" (OCAPCD, supra, 4 Cal.3d at p. 951, fn. 5, italics added.)
In California Water & Telephone Co. v. County of Los Angeles (1967) 253 Cal. App.2d 16 [61 Cal. Rptr. 618] (CWTC), the Court of Appeal was required to determine whether a county water ordinance could constitutionally apply to investor-owned public utilities. The court concluded that the ordinance, as applied, conflicted with general law and related to matters which are of statewide rather than local concern. Not only was the subject matter of the two enactments substantially identical (id. at p. 30), but the ordinance dealt with issues of more than local concern: "Moreover, the construction, design, operation and maintenance of public water utilities is a matter of state-wide concern. Of course, the county is vitally interested in the adequacy of the water supply available for fire protection. But the interest is not so parochial. All of the citizens of the complex of communities within the County of Los Angeles and in the neighboring counties are affected by the adequacy of water supply, not only for fire protection but also for other domestic and industrial uses. Under such circumstances, the control of these aspects of water utilities is not a municipal affair subject to a checkerboard of regulations by local governments. `"Neither the public nor the service corporation could tolerate as many standards and policies as there were towns, cities, or boroughs through which they operated... [R]egulations not exclusively local, those affecting the [public utilities] business as a whole, or affecting the public as a whole, and those which the nature of the business and the *799 character of the regulation require should be under the single agency of the state, are by our act committed to the exclusive jurisdiction of the Public Utilities Commission. The subject matter of this ordinance clearly falls within the exclusive jurisdiction of the commission."' (Los Angeles Ry. Corp. v. Los Angeles (1940) 16 Cal.2d 779, 787 [108 P.2d 430].)" (CWTC, supra, 253 Cal. App.2d at pp. 30-31, italics added, fn. omitted.)
In a decision of the PUC, Re Rules, Procedures and Practices Applicable to Transmission Lines Not Exceeding 200 Kilovolts (1994) 55 Cal.P.U.C.2d 87 (200 Kilovolts) provided in the record, the PUC was presented with a problem concerning jurisdiction over the construction of electric power lines and substation facilities designed to operate between 50 and 220 kilovolts.[7] Some confusion had arisen due to the PUC's previous lack of active regulation of such facilities, and local agencies had filled the breach. In its decision, the PUC explained that it was now its intent to exercise exclusive jurisdiction over all privately owned utility electric facilities in California, and it made no difference that the PUC had not expressly exercised jurisdiction over a particular matter because: "The Commission's jurisdiction is necessary to ensure that decisions made on the basis of strictly local concerns do not impede or impair the placement of facilities necessary for the rational development of a statewide utility system." (Id. at pp. 96-97; see California Coastal Comm'n v. Granite Rock Co. (1987) 480 U.S. 572, 580 [107 S.Ct. 1419, 1424-1425, 94 L.Ed.2d 577], cited therein.) The PUC concluded: "All utility-owned electric transmission lines, power lines, distribution lines, substations, and facilities remain under the Commission's exclusive jurisdiction and this jurisdiction may not be pre-empted by any local agency." (200 Kilovolts, supra, 55 Cal.P.U.C.2d at p. 112; also see Town of Woodside v. PG&E (1978) 83 Cal.P.U.C. 418.)
With all these authorities in mind, we turn to the facts of this case.

III

City's Arguments and Application of Authority
(5) City's many and various arguments may be generally categorized as follows: First, because the PUC had not enacted specific regulations over the *800 disposal of dredging spoils, City was free to do so under its police power and, because of this void, no conflict arose to justify a finding of preemption by the general law. The second argument contends that a city's regulation of disposal of dredging spoils has a different purpose than utilities regulation and, further, is authorized by other federal and state law, such that there should be no conflict giving rise to preemption. We discuss these theories in turn.

A

Lack of Specific PUC Regulation
The narrow question presented is whether City's floodplain ordinance has "enter[ed] an area that is `fully occupied' by general law" (Sherwin-Williams, supra, 4 Cal.4th at p. 898), due to evident legislative intent that is impliedly present under the second of the three usual tests for such implied preemption, i.e., has the subject matter been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action? (Ibid.) (Neither the rule of express preemption nor the first and third tests for implied preemption, as stated in Sherwin-Williams, supra, 4 Cal.4th at pp. 897-898, appear to be readily applicable under these facts; see pp. 792-793, ante.)
The first question to answer is what definition should the subject "field" of regulation be given. (CWTC, supra, 253 Cal. App.2d at pp. 27-28.) It is not disputed that the PUC has not specifically regulated the activity of disposing of the spoils of dredging; as argued by the amici curiae cities, "A vacuum exists that has been appropriately filled by Carlsbad's Special Use Permit." Nor is it disputed that, as stated in City's opposition to the SDG&E motion, the purpose of maintenance dredging "is to increase the operating efficiency of the [p]lant by providing more water for cooling and to reduce risk of the closing of the mouth of the [l]agoon, for the benefit of SDG&E's facility and the ecosystem of the [l]agoon."
The PUC has been given the power in section 701 to "supervise and regulate every public utility in the State" and to "do all things, whether specifically designated in this part or in addition thereto, which are necessary and convenient in the exercise of such power and jurisdiction." Section 768 then gives the PUC the power to require health and safety measures in the operation of utilities, such as requiring public utilities to "construct, maintain, and operate its line, plant, system, equipment, apparatus, tracks, *801 and premises in a manner so as to promote and safeguard the health and safety of its employees, passengers, customers, and the public," among other things. Sections 761 and 762 allow the PUC to regulate utilities regarding the performance of services or furnishing of commodities, and regarding additions to, repair, or change in physical property, and related matters. However, under section 2902, municipalities retain the power to regulate streets and speed limits, etc., within their jurisdictions.
City argues here that it should be allowed to regulate disposition of spoils within its city limits (albeit on state owned and operated public beaches) because its residents have an interest in safe and sandy beaches, which should give rise to concurrent jurisdiction between City and the PUC over this activity. City contends the disposition of spoils does not constitute an essential utility facility or activity, such as the trial court found was involved, and that maintenance dredging itself can and must be differentiated from the spoils of such dredging.
To support its position, City relies on OCAPCD, supra, 4 Cal.3d 945, where the PUC and an air pollution control district were found to have concurrent jurisdiction over a utility whose activities were regulated by both. (Id. at p. 947.) However, this reliance is misplaced, because the Supreme Court was careful to distinguish between the situations in which the PUC's "authority is pitted against that of a local government involving a matter of statewide concern" (id. at p. 951, fn. omitted), (in which case the PUC is normally found to have paramount jurisdiction), and other situations in which PUC "jurisdiction conflicts with other than a local agency" (ibid., original italics), in which case "commission directives have not been given such controlling effect." (Ibid.) This authority does not clearly allow for concurrent jurisdiction over utility-related activity at different levels of government, but only for concurrent regulation by equivalent agencies.
The OCAPCD authority, supra, 4 Cal.3d at page 951, footnote 5, further indicates that even though a matter may be of local geographical concern, it may still essentially be a subject of statewide concern (giving such examples as the business of supplying telephone service, the construction and maintenance of telephone lines within a city, and the control of city streets at railroad grade crossings). Thus, the location of the beaches within City limits is not dispositive here.
Moreover, the PUC itself, in the 200 Kilovolt case, expressed an intent to exercise exclusive jurisdiction over "[a]ll utility-owned electric transmission *802 lines, power lines, distribution lines, substations, and facilities" (200 Kilovolts, supra, 55 Cal.P.U.C.2d at p. 112), and to clarify that "this jurisdiction may not be pre-empted by any local agency." (Ibid; see fn. 7, ante, regarding persuasiveness of administrative interpretations of regulations.) Notwithstanding that well-accepted rule endorsing administrative interpretations of the agency's governing regulations, we do not find the advisory opinion issued by the PUC legal department to be controlling in this instance. The advisory opinion itself points out that the parties do not agree on the precise nature of the dispute, and expressly states that its conclusion that City would not be preempted from regulating the placement of sand on beaches within its limits, resulting from SDG&E dredging operations, is based on an assumption that the issue presented did not involve SDG&E's right to perform dredging at all, nor the continued feasibility of operating the plant as designed. The advisory letter goes on to state that the PUC "retains paramount jurisdiction vis-a-vis the city over the project." This authority can be read to support either side in this dispute.
Even though courts do not readily find implied preemption of a field of endeavor where it is deemed possible to read conflicting enactments in such a way as to uphold both (People ex rel. Deukmejian v. County of Mendocino, supra, 36 Cal.3d at p. 484; Conway v. City of Imperial Beach, supra, 52 Cal. App.4th at pp. 84-85), we do not believe this is such a case. The essential maintenance activity of dredging cannot be performed unless the spoils of dredging can be deposited somewhere, and City has not shown that its local police power interest in protecting in a particular manner the state beaches within its boundaries is necessarily compatible with the statewide interest in ensuring that utility operations are conducted in a safe and efficient manner. (Vernon, supra, 41 Cal. App.4th at p. 217.) It makes no difference that a nearby beach is not technically part of a plant facility, when the design and operation of the plant requires ongoing dredging and disposition of spoils on nearby beaches. That the PUC "may" supervise and regulate every public utility in the state in a manner that is "necessary and convenient" (§ 701) does not mean that if it does not expressly do so, a local entity may fill the breach with legislation that places a burden on the operation of utility facilities. (200 Kilovolts, supra, 55 Cal.P.U.C.2d at pp. 95-97.)
Here, City's requirement of a special use permit for dredging, placing conditions on the exercise of SDG&E's right to dredge, on its face places a significant physical and economic burden on SDG&E's operation and maintenance of its facilities. The floodplain ordinance is subject to enforcement through criminal and civil sanctions. This form of regulation goes beyond *803 City's police power into a field that is significantly and fully occupied by the state in such a manner as "`to indicate clearly that a paramount state concern will not tolerate further or additional local action.' [Citation.]" (Sherwin-Williams, supra, 4 Cal.4th at p. 898.) Section 2902, giving local entities power to promote safety in certain respects, does not preserve local power to regulate this particular portion of an essential maintenance activity of the plant. (Vernon, supra, 41 Cal. App.4th at p. 217; see Cal. Const., art. XI, § 9, subd. (b).)[8]
As emphasized by the Supreme Court in the San Diego Gas & Electric Co. v. Superior Court, supra, 13 Cal.4th 893, California courts will find concurrent jurisdiction in controversies between utilities and others only if such a result is not inimical to the purposes of the Public Utility Act. (Id. at p. 944, quoting Vila v. Tahoe Southside Water Utility, supra, 233 Cal. App.2d at p. 477.) The broad language of section 701 indicates that such purposes include statewide uniformity of regulation over utility facility operations. (Vernon, supra, 41 Cal. App.4th at pp. 215-217.) California Constitution, article XII, section 8 establishes that "A city, county, or other public body may not regulate matters over which the Legislature grants regulatory power to the Commission." Here, even if such regulatory power has not been expressly exercised, the power still resides in the PUC, not a local entity, due to the essential nature of the maintenance operation.
In conclusion on this point, we reject City's argument that the trial court's ruling erroneously failed to specify if the floodplain ordinance were void as facially unconstitutional or only as applied. Facial challenges consider only the text of a measure, not the application of the measure to particular circumstances. (Tobe v. City of Santa Ana (1995) 9 Cal.4th 1069, 1084 [40 Cal. Rptr.2d 402, 892 P.2d 1145].) The gist of both the complaint and cross-complaints clearly dealt with an as-applied challenge, particularly with regard to the utility context. The trial court was not required to rule on the facial validity of dredging regulation as to other types of building or maintenance work, nor on the hypothetical issue of whether the ordinance would be enforceable using some other type of remedy than a stop work order (such as was used here). Nor was the court required to deal with the appropriate remedy to be followed by City if its floodplain ordinance were unenforceable, as the pleadings did not clearly present that issue, as the court correctly concluded in its ruling. Whether City should have pursued *804 grievance proceedings under section 1702 et seq. was not then at issue. However, as noted in Vernon, supra, 41 Cal. App.4th at page 217, if City continues to believe the PUC's standards are inadequate, it may direct its concerns to that entity.

B

Different Purposes of Alternative Regulatory Schemes
In its alternative argument, City contends that it was authorized to enact its floodplain ordinance and related coastal development ordinance (CMC, chs. 21.80, 21.110 et seq.) under federal and state law, which directed it to accomplish certain purposes that are unrelated to utility regulation. Specifically, it relies on coastal preservation goals as set forth in the California Coastal Act of 1976 (Pub. Resources Code, § 30000 et seq., Coastal Act), and the National Flood Insurance Act of 1968 (42 U.S.C. § 4001 et seq.), which required local entities to enact such regulations if they wished to make their residents eligible for disaster relief. Further, City contends its general police power to enact planning and zoning laws under Government Code section 65302 et seq. should give it independent power and concurrent jurisdiction to regulate the disposition of dredging spoils as it affects, e.g., erosion control. (Gov. Code, § 65302, subd. (d)(4).)
City relies on the rule that if local legislation clearly serves local purposes, state legislation that appears to be in conflict but that actually serves different statewide purposes will not be found to have preemptive effect. (Santa Monica Pines, Ltd. v. Rent Control Board, supra, 35 Cal.3d at pp. 868-869.) Conflicting statutes should be harmonized wherever possible to give each effect. (Conway v. City of Imperial Beach, supra, 52 Cal. App.4th at pp. 84-85.) The local purpose asserted here is regulation of land use to restrict development in flood-prone areas, in order to minimize expensive flood damage.
Certainly, City had the duty to comply with the policies and regulations of the federal Flood Insurance Act and the state Coastal Act and land use law. However, such compliance does not authorize local regulation in a field otherwise occupied as a matter of statewide interest, and has nothing to do with the actual issue presented here: The legality of local restrictions on maintenance dredging by a highly regulated utility. Essentially, the *805 floodplain ordinance adds another layer of regulation onto the operation and maintenance of the utility plant. This constitutes the kind of "checkerboard of regulations by local governments" that was disapproved in CWTC, supra, 253 Cal. App.2d at page 31: "`"Neither the public nor the service corporation could tolerate as many standards and policies as there were towns, cities, or boroughs through which they operated ... [R]egulations not exclusively local, those affecting the [public utilities] business as a whole, or affecting the public as a whole, and those which the nature of the business and the character of the regulation require should be under the single agency of the state, are by our act committed to the exclusive jurisdiction of the [PUC]...."'" (Fn. omitted.) There is no independent and separate local purpose here justifying this type of local regulation of the activity of maintenance dredging.[9]
Finally, we are compelled by the above analyses to reject the proposed standards offered by the amici curiae cities to permit local regulation of public utilities where local law does not directly conflict with PUC rules and regulations, and where no state regulation directly conflicts with local law.[10] Each of these standards disregards the rule of implied preemption and would promote endless litigation to resolve questions of whether local law infringes on an occupied field, and whether such regulations would "unreasonably interfere" with essential public utility functions or facilities. Particularly in the utility field, a bright line rule is preferable, and we choose to draw a more readily definable line in the sand. As applied to the SDG&E plant, the floodplain ordinance dredging regulation is impliedly preempted by state regulation.

*806 DISPOSITION
The summary judgment is affirmed.
McIntyre, J., and O'Neill, J.,[*] concurred.
Appellants' petition for review by the Supreme Court was denied September 23, 1998.
NOTES
[1] All further statutory references are to the Public Utilities Code unless otherwise specified.
[2] Relief in mandamus and injunctive relief were requested to prevent City from enforcing the conditions of its special use permit. These requests were later dismissed, leaving only the declaratory relief issue.
[3] Before oral argument, City advised this court that due to a merger of companies, the plant was anticipated to be sold by SDG&E by the year 2000 and inquired if further briefing on the effect of that factual development was desired. We did not seek such further briefing at this time as the issues presented must be decided on the current record.
[4] In support of appellants' position, the Cities of Bakersfield, Eureka, San Luis Obispo, San Pablo, Monterey, Chula Vista. Poway, Encinitas, Calabasas, Rialto, Carson, Berkeley, Culver City, Walnut Creek. Santa Rosa, Benecia, Coronado, San Rafael, Vista, Galt, Palm Springs, Ross, San Anselmo, Escondido, Redding, Redlands, Vacaville, Montebello, Marina, Del Rey Oaks, Vernon, Needles, Saratoga, Palm Desert, Hayward, Burbank, San Francisco, Long Beach, Walnut, Pico Rivera, Albany, Anaheim, Del Mar, Merced, Morro Bay, Saint Helena, Modesto, Lafayette, Imperial Beach, Woodlake, Visalia, Tulare, Porterville, Lodi, Moreno Valley, San Fernando, Malibu, Capitola, Burlingame, Sacramento and Campbell have filed an amici curiae brief.
[5] To support its position that PUC jurisdiction is exclusive here, SDG&E cites to section 761, allowing the PUC to establish rules for performance of services or furnishing of commodities by a public utility, and section 762, dealing with PUC orders for additions to, repair, or change in physical property, and related matters. These sections allow extensive PUC regulation of facilities.
[6] "Air pollution control districts were created by the Legislature in 1947 to protect the state's `primary interest in atmospheric purity' (Health & Saf. Code, § 24198). The air pollution control district is the agency charged with enforcing both statewide and district emission controls. (§ 24224.)" (OCAPCD, supra, 4 Cal.3d at p. 948, italics and fns. omitted.)
[7] In Western Oil & Gas Assn. v. Monterey Bay Unified Air Pollution Control Dist. (1989) 49 Cal.3d 408, 425 [261 Cal. Rptr. 384, 777 P.2d 157], the court noted that contemporaneous constructions of a statute by an administrative agency charged with its enforcement are entitled to great weight.
[8] This record does not present the abstract question of whether a local entity may regulate, within its jurisdiction, the disposal of dredging spoils taken in the operation of a public utility, and we express no opinion on that subject.
[9] SDG&E points out that under its lease from the SLC it is allowed to deposit sand on state beaches, so that any jurisdiction over sand dumping should reside in the SLC. (Pub. Resources Code, §§ 6301, 6303, 6306.1, 6828.) It also claims that the California Coastal Act of 1976 regulates development of energy facilities (Pub. Resources Code, § 30601, subd. (3)), and under CMC section 21.80.030(b)(3), this plant is specifically exempted from coverage by the terms of the coastal development ordinance. These alternate jurisdictional issues need not be decided in our examination of the floodplain ordinance itself. (CMC, ch. 21.110 et seq.)
[10] As stated by amici curiae cities, their preferred standard for determining when a city can regulate a public utility is as follows: If no PUC order, rule or regulation exists governing the specific area sought to be regulated and no statutory provision covers the area, cities should be allowed to regulate public utilities operating in their jurisdiction on these matters. The modified standard offered would allow cities to regulate public utilities in the manner described above, "with the exception that if such regulation would unreasonably interfere with an essential public utility function or facility, such regulation would be deemed preempted because of such unreasonable interference." (Italics omitted.)
[*] Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.